[No. 39333-6-II.   Division Two.   November 24, 2010.]

MICHAEL GENDLER, *Respondent*, v. JOHN R. BATISTE, *as Chief of the Washington State Patrol*, ET AL., *Appellants*.

*Robert M. McKenna, Attorney General, Rene D. Tomisser, Senior Counsel,* and *Shannon E. Inglis, Assistant,* for appellants.

*Keith L. Kessler* (of *Stritmatter Kessler Whelan Coluccio*) and *Charles K. Wiggins* (of *Wiggins & Masters PLLC*), for respondent.

¶1 PENOYAR, C.J. — The Washington State Patrol (WSP) appeals from a summary judgment order requiring it to disclose historical bicycle accident records occurring on Seattle's Montlake Bridge. The WSP claims that federal law, 23 U.S.C. § 409, prohibits it from disclosing the records to Michael Gendler unless he agrees not to use the information in litigation against the State. Because RCW 46.52.060 imposes a duty on the WSP to create and provide such public records, and because the federal privilege applies only to the Washington State Department of Transportation (WSDOT), not the WSP, we affirm. We also award Gendler his attorney fees and costs for this appeal.

## FACTS

¶2 On October 28, 2007, Gendler was crossing the Montlake Bridge in Seattle when his bicycle tire became

wedged in the bridge grating, tossing Gendler from his bicycle onto the bridge deck. He suffered a serious spinal injury, leaving him with quadriplegia, unable to live independently, and unable to work full time in his law practice.

¶3 After learning that other bicyclists had had similar debilitating accidents on the Montlake Bridge, Gendler suspected that the roadway had been unsafe for cyclists since 1999 when the State replaced the bridge decking. He sought records of other bicycle accidents from Kip Johnson, the WSP public records employee. Johnson explained that she could provide records to Gendler if he identified the person involved in the collision and the collision date. She explained that WSP does not store accident reports by location and thus she could not provide him with such a list. Gendler also learned that he could obtain specific records from the WSP web site, but only if he certified that he would not use the records in a lawsuit against the State of Washington.[1]

¶4 Gendler acknowledges that he may sue the State if the reports show that the State was on notice for years that the bridge deck was unsafe for bicyclists. He further explains that he does not want to waive his right to use public records in a civil suit to hold the State accountable for its negligence, nor does he want to waive his right as a public citizen to be fully informed about the history of the bridge and the government agencies' conduct toward keeping the roadway reasonably safe.

¶5 This current action stems from Gendler's complaint against the WSP for violating the Public Records Act (PRA), chapter 42.56 RCW, claiming that these are public records and the WSP must provide them without requiring him to certify that he would not use them against the State. He seeks an order requiring the WSP to provide the records and pay attorney fees, costs, and fines.

---

[1] The form, "Request for Collision Data DOT Form 780-032 EF," requires the requesting party to agree to the following: "I hereby affirm that I am not requesting this collision data for use in any current, pending or anticipated litigation against state, tribal or local government involving a collision at the location(s) mentioned in the data." Clerk's Papers (CP) at 27.

¶6 The trial court allowed the WSDOT to intervene as it now compiles the traffic data that WSP provides to it and only WSDOT can produce an historical list of traffic accidents based on a physical location. On cross motions for summary judgment, the trial court granted relief to Gendler after finding that the WSP had a statutory duty under RCW 46.52.060 to provide the requested information notwithstanding 23 U.S.C. § 409. Additionally, the trial court awarded Gendler his attorney fees, costs, and penalties, totaling $140,798.79.

¶7 The question before us in this appeal is whether collision records collected and compiled by the WSDOT in compliance with the "Federal Highway Safety Act" are privileged under 23 U.S.C. § 409 such that the WSP need not provide these records despite its duty under RCW 46.52.060 to "file, tabulate, and analyze all accident reports and to publish annually . . . the number of accidents, the location, the frequency, . . . and the circumstances thereof." The WSP also asserts that Gendler's use of the PRA to obtain a ruling on an evidentiary rule disqualifies his claim to attorney fees, costs, and penalties.

## ANALYSIS

### I. FEDERAL PRIVILEGE

#### A. Background

¶8 In 1966, Congress passed 23 U.S.C. § 402, the highway safety programs, which created national highway safety standards, required the states to design programs to implement these standards, and provided federal grants to help support state programs. 23 U.S.C. § 402(a), (m). In 1968, the United States Department of Transportation required states to identify and correct high-collision locations by collecting traffic records that identified collision locations, collision types, injury types, and environmental conditions. Uniform Standards for State Highway Safety Programs, 33 Fed. Reg. 16,560 (Nov. 14, 1968).

¶9 In 1973, Congress passed 23 U.S.C. § 152, the "Hazard Elimination Program." This program funded improvements on nonfederal roads, requiring a greater collection and compilation of data to identify locations and priorities for improvements. Specifically, it required that states plan highway safety improvements "on the basis of crash experience [or] crash potential" and required states to collect and maintain a record of highway collision data. 23 C.F.R. § 924.9(a)(3)(i)(A).

¶10 In 1987, Congress passed 23 U.S.C. § 409 to protect the states from tort liability engendered by the increased self-reporting of hazardous collision data. Amended twice to further broaden protections for states, § 409 now provides:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148 of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

¶11 The United State Supreme Court explained the scope of this provision in *Pierce County v. Guillen*, 537 U.S. 129, 145-46, 123 S. Ct. 720, 154 L. Ed. 2d 610 (2003):

> The interpretation proposed by the Government, however, suffers neither of these faults. It gives effect to the 1995 amendment by making clear that § 409 protects not just the information an agency generates, *i. e.*, compiles, for § 152 purposes, but also any information that an agency collects from other sources for § 152 purposes. And, it also takes a narrower view of the privilege by making it inapplicable to information compiled or collected for purposes unrelated to § 152 and held by agencies that are not pursuing § 152 objectives. We therefore adopt this interpretation.

Our conclusion is reinforced by the history of the 1995 amendment. As we have already noted, the phrase "or collected" was added to § 409 to address confusion among the lower courts about the proper scope of § 409 and to overcome judicial reluctance to protect under § 409 raw data collected for § 152 purposes. By amending the statute, Congress wished to make clear that § 152 was not intended to be an effort-free tool in litigation against state and local governments.

(Citation omitted.)

¶12 The WSP argues that its police traffic collision reports (PTCR) fall under § 409 protections because it provides and WSDOT collects the data for a 23 U.S.C. § 152 purpose, namely, compliance with the Hazard Elimination Program. It notes that the Federal Highway Administration (FHA) issued a memorandum after *Guillen*, explaining that even if the collision reports are stored in an integrated database (i.e., used by multiple agencies for different purposes), the collision data remains protected under § 409 because it is, at least in part, there for a § 152 purpose. Finally, the WSP argues, citing *Guillen*, that the data is subject to unbridled disclosure only when it is collected solely for law enforcement purposes and is held by a law enforcement agency.

¶13 The WSP explains that the PTCR was developed specifically for § 152 compliance, that WSDOT must demonstrate its compliance to the FHA, and that it is undisputed that the WSDOT database was developed specifically for showing that compliance.

B. RCW 46.52.060

¶14 In 1937, our state legislature passed the "Washington Motor Vehicle Act." LAWS OF 1937, ch. 189. Section 135 of this comprehensive legislation requires law enforcement officers to prepare accident reports on state highways. Section 138 imposes a duty on the WSP chief:

It shall be the duty of the chief of the Washington state patrol to file, tabulate and analyze all accident reports and to publish

annually, immediately following the close of each calendar year, and monthly during the course of the calendar year, statistical information based thereon showing the number of accidents, the location, the frequency and circumstances thereof and other statistical information which may prove of assistance in determining the cause of vehicular accidents.

Such accident reports and analysis or reports thereof shall be available to the directors of the departments of highways, licenses, public service or their duly authorized representatives, for further tabulation and analysis for pertinent data relating to the regulation of highway traffic, highway construction, vehicle operators and all other purposes, and to publish information so derived as may be deemed of publication value.

Former RCW 46.52.060 (LAWS OF 1937, ch. 189, § 138). In fulfilling this duty, for many years, the WSP and other agencies provided accident histories at particular locations, photographs, complaints, traffic counts, road maintenance records, and other information. Until 2003, the WSP could provide data based on location, but its ability to do so was limited.[2]

¶15 In 2003, the Supreme Court decided *Guillen*, which held in part that § 409 "does not protect information that was originally compiled or collected for purposes unrelated

---

[2] Kip Johnson explained in her deposition:

We entered all this information into a mainframe, and from that mainframe we got printed reports on city streets and country roads. We did—I think state routes might have been just too much for our system, so we never did do that.

[WSDOT] also had a system where we downloaded the information to them that—we got this information back from them on the locations and the diagram data, and we entered that, and then they downloaded it into their system, and we left all that up to them.

We did county roads and city streets, and we had sort of like canned reports, printed reports that would come out that would—like for country roads it would have all these five-digit road log numbers, so you had to know the mileposts and the five-digit road log number, and, as far as I know, no average person knows that for the country roads.

Cities would have been a little bit easier because I would have had a city street name and then a reference, but I would have to look through all the reports because even the data entry was not consistently uniform. So I would roll out a big long bunch of paper reports and try to find every reference to that particular street I could, and that was time-consuming. Now a computer does that.

CP at 305.

to § 152 and that is currently held by the agencies that compiled or collected it, even if the information was at some point 'collected' by another agency for § 152 purposes." 537 U.S. at 144.

¶16 Shortly after the *Guillen* decision, the WSDOT and the WSP entered into a memorandum of understanding (MOU) that as of July 1, 2003, WSDOT would maintain all accident reports in its database.[3] While the WSP gave the WSDOT a "nonexclusive, royalty-free, irrevocable license to publish, translate, reproduce, deliver, perform, display, and dispose of copies of the scanned images or PTCR and VCR [Vehicle Collision Report]/Citizen Reports," "the reports and scanned images of those reports are the property of WSP." Clerk's Papers (CP) at 206.

¶17 The MOU also provided:

[(2)(a)(1).] All public disclosure requests for copies of any PTCR must be submitted in writing on DOT Form 780-030 "Request for Copy of Collision Report" to the WSDOT's Collision Records Request Section, located in the Transportation Data Office in Olympia.

. . . .

[(2)(a)(5).] Searches for PTCRs must be based on an involved person's name or a report number. Any request for multiple reports based solely on location will be treated as a request for collision data, and the request will be referred to the WSDOT's Collision Data and Analysis Branch (see below).

. . . .

[(5)(e).] . . . The WSP public disclosure policy will control the release of all PTCR and VCR/Citizen Reports. The WSDOT public disclosure policy will control the release of all collision data.

CP at 208, 209, 212.

---

[3] The WSP would scan the documents into the system, send them to the WSDOT, and destroy the originals.

## C. Public Records Act

■ ¶18 In 1973, the people of this State adopted the "Public Disclosure Act" (PDA) through initiative.[4] The public records portion of this act required all state and local agencies to disclose any public record upon request, unless it fell within an enumerated exception. Former RCW 42.17.260(1) (2005). Now codified in chapter 42.56 RCW, the PRA's purpose is set out in RCW 42.56.030:

> The people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created. This chapter shall be liberally construed and its exemptions narrowly construed to promote this public policy and to assure that the public interest will be fully protected. In the event of conflict between the provisions of this chapter and any other act, the provisions of this chapter shall govern.

RCW 42.56.030.

> The stated purpose of the Public Records Act is nothing less than the preservation of the most central tenets of representative government, namely, the sovereignty of the people and the accountability to the people of public officials and institutions. RCW 42.17.251. Without tools such as the Public Records Act, government of the people, by the people, for the people, risks becoming government of the people, by the bureaucrats, for the special interests. In the famous words of James Madison, "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." Letter to W.T. Barry, Aug. 4, 1822, 9 *The Writings of James Madison* 103 (Gaillard Hunt, ed. 1910).

*Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 251, 884 P.2d 592 (1994).

■ ■ ¶19 The purpose of the PRA is to provide "full access to information concerning the conduct of government

---

[4] *See* LAWS OF 1973, ch. 1 (Initiative 276, then codified as chapter 42.17 RCW).

on every level . . . as a fundamental and necessary precondition to the sound governance of a free society." RCW 42.17.010(11). The PRA, RCW 42.56.001-.902 (formerly codified as RCW 42.17.250-.348 in the PDA) requires all state and local agencies to disclose any public record upon request, unless it falls within certain specific enumerated exemptions. *See Sperr v. City of Spokane*, 123 Wn. App. 132, 136, 96 P.3d 1012 (2004); *King County v. Sheehan*, 114 Wn. App. 325, 335, 57 P.3d 307 (2002); RCW 42.56.070(1). The requested record must be made available "for public inspection and copying." RCW 42.56.070(1). The WSP is an "agency" subject to the provisions of the act. Former RCW 42.17.020(2) (defining "agency" to include any state office or department) (Laws of 2005, ch. 445, § 6); *see also* former RCW 42.56.010 (referencing RCW 42.17.020) (Laws of 2005, ch. 274, § 101).

¶20 Public records subject to inspection under the act include (1) any writings (2) that contain information related to the "conduct of government or the performance of any governmental or proprietary function" and (3) that are "prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." RCW 42.56.010(2); former RCW 42.17.020(42) (2008). An agency has no duty under the PRA, however, to create or produce a record that does not exist at the time the request is made. *Sperr*, 123 Wn. App. at 136-37; *Smith v. Okanogan County*, 100 Wn. App. 7, 13-14, 994 P.2d 857 (2000). Further a request under the PRA must be for an " *'identifiable public record*[ ],' " *Hangartner v. City of Seattle*, 151 Wn.2d 439, 447-48, 90 P.3d 26 (2004) (quoting former RCW 42.17.270 (1987)), and a mere request for *information* does not so qualify. *Wood v. Lowe*, 102 Wn. App. 872, 879, 10 P.3d 494 (2000); *Bonamy v. City of Seattle*, 92 Wn. App. 403, 410-12, 960 P.2d 447 (1998). Moreover, although there is no official format for a valid PRA request, "a party seeking documents must, at a minimum, [(1)] provide notice that the request is made pursuant to the PDA[/PRA] and [(2)] identify the documents with reasonable clarity to allow the agency to locate them." *Hangartner*, 151 Wn.2d at 447.

¶21 Gendler argues that the WSP has done exactly what these statutes prohibit; i.e., not produce records in its control that it has an obligation to produce. He points to the deposition testimony of Daniel Parsons, the chief information officer of the WSP, who testified that the WSP could develop a database to produce historical collection records based on location.

D. Analysis

¶22 We hold that the trial court acted properly when it ordered the WSP "to provide copies of these records on request without the limitation offered by Defendant."[5] CP at 322.

¶23 Although the WSDOT may use the PTCR records to comply with § 152, the WSP does not. The WSP has an independent statutory obligation to collect traffic collision reports. Apparently, it stopped doing this in 2003, but delegating its duty to maintain the records to another agency does not shield WSP from its obligations under the PRA.

¶24 The Supreme Court in *Guillen* made clear that information gathered by law enforcement agencies for law enforcement purposes is not protected under § 409. What complicates the current situation is that the WSP through the MOU makes the WSDOT the custodian of its records and has the WSDOT compile and analyze the data. It was for this reason that Gendler sued the WSP and not the WSDOT. His position has been from the outset that the WSP has a duty, independent of WSDOT's § 152 obligations, to collect data and publish reports "showing the number of accidents, the location, the frequency, . . . and the circumstances thereof." RCW 46.52.060. As Gendler notes, administrative inconvenience does not relieve an agency of its duty to comply with the PRA. *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 130, 580 P.2d 246 (1978) (cost and excessive

---

[5] Gendler's request was for "[a]ll police reports relating to collisions involving bicycles on the Montlake Bridge in Seattle (SR 513)." CP at 320.

disruption to department of assessments did not outweigh the public benefit of disclosure).

¶25 In its reply brief, the State acknowledges that RCW 46.52.060 requires the WSP to report collisions by location, which it claims its reports now provide by naming the county where the accident occurred. It argues that to accept Gendler's argument would be to require the WSP to produce reports in greater detail than is necessary for law enforcement purposes. It argues that even though it is technologically possible for it to do so, it should not be required to do so because that is beyond what it needs for law enforcement purposes. The only purpose for building such a database, it argues, would be to circumvent § 409 for litigation purposes.

¶26 The State goes on to argue, however, that the PTCRs themselves are privileged because the WSDOT has custody of the records and it is a § 152 agency. It then misconstrues *Guillen* to apply privilege when the data has been collected for both § 152 and non-§ 152 purposes:

> Under this interpretation, an accident report collected only for law enforcement purposes and held by the county sheriff would not be protected under § 409 in the hands of the county sheriff, even though that same report would be protected in the hands of the Public Works Department, so long as the department first obtained the report for § 152 purposes.

*Guillen*, 537 U.S. at 144. What the State fails to explain, however, is how the county sheriff in this example is any different from the WSP or how the Public Works Department is any different from the WSDOT. The PTCR report, in the hands of the WSP, would not be privileged as it would be in WSDOT's hands because each agency uses that report for different purposes.

¶27 The State then argues that the WSP does not use many of the categories of information in the PTCR and that information is collected only for the WSDOT, which uses it for its compliance with § 152. The trial court found little merit to this claim, discounting it because law enforcement

officers still complete the form for WSP statutory purposes. Gendler argues that this State revised the PTCR in 1968, yet Congress did not enact § 152 until 1973 so the State's claim is flawed. Gendler also reasons that regardless of the information on the PTCR, it is a public record filled out by a law enforcement officer as part of his duties under state law.

¶28 The WSP argues that the legislature has never defined "location" as that term is used in RCW 46.52.060, and it claims that its annual reports, which show accident data by county, fulfill its statutory duty. We disagree. As we set out above, RCW 46.52.060 requires the WSP chief to "file, tabulate, and analyze all accident reports." It also requires the WSP to produce "statistical information based thereon showing the number of accidents, the location, the frequency, . . . and the circumstances thereof, and other statistical information which may prove of assistance in determining the cause of vehicular accidents." RCW 46.52.060.

¶29 Certainly, there is one overriding purpose here and that is to improve the safety of our roadways. A report indicating only that a certain percentage of accidents occurred in King or Pierce County would serve no purpose other than an academic one. It would not and does not assist the WSP on where and when to assign troopers and it would not assist the WSP or anyone else in analyzing the causes of vehicular accidents, which is the express purpose that animates the obligation RCW 46.52.060 imposes on the WSP.

¶30 While we agree that the WSDOT need not provide unbridled access to collision data, the WSP must produce the reports in compliance with its independent statutory obligation and as such must disclose those reports when requested under the PRA.

## II. Non-PRA Purpose

¶31 The WSP also argues that the trial court erred in imposing costs, attorney fees, and penalties because Gend-

ler's purpose in filing his complaint was not to obtain public records but to get a ruling on the interplay of § 409 and the PRA. The WSP relies on *Daines v. Spokane County*, 111 Wn. App. 342, 349, 44 P.3d 909 (2002), which held that a plaintiff "must show that the action was necessary to obtain the information in the first place."

¶32 The State explains that Gendler did not have to file a PRA lawsuit to obtain the collision records as the records were available and the WSP routinely provides them upon request. The State reasons that Gendler's PRA lawsuit instead was solely to resolve an evidentiary dispute over whether the collision records were within the § 409 privilege forbidding their use in actions for damages.

¶33 The State ignores, however, that Gendler could not obtain the records from the WSP without agreeing that he would not use them in litigation against the State. Gendler's argument throughout has been that the WSP must produce the records under its duty imposed by RCW 46.52.060. Whether the State had an obligation to produce the collision records under the PRA without such a caveat is the crux of this matter, and resolving that question involves the scope of the PRA. Gendler had to resort to this lawsuit in order to obtain the public records he wanted without a § 409 limitation. The trial court properly awarded costs, attorney fees, and penalties for this remedial action.

III. ATTORNEY FEES

¶34 Gendler requests an award of attorney fees as the prevailing party on appeal. RCW 42.56.550(4) allows such fees and includes attorney fees on appeal. *Progressive Animal Welfare*, 125 Wn.2d at 271. His request is appropriate and upon his compliance with RAP 18.1, a commissioner of this court will determine the proper amount of the award.

¶35 Affirmed.

BECKER and WORSWICK, JJ., concur.

Review granted at 171 Wn.2d 1001 (2011).