[No. 85408-4.   En Banc.]

Argued October 11, 2011.   Decided April 12, 2012.

MICHAEL W. GENDLER, *Respondent*, v. JOHN R. BATISTE, *as Chief of the Washington State Patrol, Petitioner*.

*Robert M. McKenna, Attorney General,* and *Rene D. Tomisser, Senior Counsel,* for petitioner.

*Keith L. Kessler* and *Garth L. Jones* (of *Stritmatter Kessler Whelan Coluccio*); and *Kenneth W. Masters* and *Shelby R. Frost Lemmel* (of *Masters Law Group PLLC*), for respondent.

*Katherine George* on behalf of Allied Daily Newspapers of Washington and Washington Newspaper Publishers Association, amici curiae.

*Michael E. Tardif* on behalf of Washington Cities Insurance Authority and Washington Counties Risk Pool, amici curiae.

*Bryan P. Harnetiaux* and *George M. Ahrend* on behalf of Washington State Association for Justice Foundation, amicus curiae.

¶1 FAIRHURST, J. — This case involves the Public Records Act (PRA), chapter 42.56 RCW, and its interplay with two statutes, RCW 46.52.060 and 23 U.S.C. § 409. Michael W. Gendler made a public records request for location-specific accident reports from the Washington State Patrol (WSP). The WSP refused to provide the records unless Gendler certified that he would not use the records in any litigation

against the State, claiming a federal statute, 23 U.S.C. § 409, protected the records sought. WSP claimed the records were shielded because they were located in an electronic database that the Department of Transportation (DOT) utilized for purposes related to the federal hazard elimination program, 23 U.S.C. § 152.

¶2 Gendler then brought a suit under the PRA and argued § 409 does not apply to the WSP because it did not compile or collect the information for § 152 purposes. Rather, the information was collected pursuant to WSP's statutory duty under RCW 46.52.060. The trial court agreed and, on summary judgment, ordered WSP to produce the requested accident reports. The Court of Appeals affirmed. We also affirm because § 409 does not extend to police accident reports generated and received by WSP pursuant to its own statutory duty.

## I. FACTUAL AND PROCEDURAL HISTORY

¶3 Gendler was riding his bicycle across Seattle's Montlake Bridge when his front wheel was suddenly trapped in a seam on the bridge deck grating. Gendler was thrown forward onto the roadway, seriously injuring his spine and rendering him quadriplegic. As a result, he is no longer able to work full time in his law practice or live independently.

¶4 Gendler subsequently learned that other bicyclists had been injured after their bicycle wheels were jammed in the same manner on the same bridge. Alarmed by these facts, Gendler sought out the history of such incidents by making a public records request to the WSP. Specifically, he requested copies of police reports on all accidents on the Montlake Bridge involving bicycles.

¶5 The WSP responded that it could not provide accident reports by location and that it would provide records to Gendler only if he were able to specifically identify the person involved in the collision and the precise collision

date. Gendler was also informed that only the DOT was able to produce a historic list of traffic accidents based on physical location and referred to a "Request for Collision Data" form that would be necessary before the State would fulfill his request.[1] Clerk's Papers (CP) at 27.

¶6 After locating the form, Gendler discovered it required a certification that he would not use the records in a lawsuit against the State or other government agency. The exact language from the request form reads, "I hereby affirm that I am not requesting this collision data for use in any current, pending or anticipated litigation against a state, tribal or local government involving a collision at the location(s) mentioned in the data." *Id.* This certification is purported to be in accordance with 23 U.S.C. § 409, a limited federal privilege that protects from discovery certain records that the states create and compile for federal highway safety reporting purposes. Gendler was unwilling to submit this certification, explaining:

> Because I do not want to waive my right to use public records including reports of bicycle accidents on the Montlake Bridge in a civil lawsuit to hold the State accountable for its negligence, I cannot sign the public record request form. But I also do not want to waive my right as a citizen to have access to these public records to promote my ability to become fully informed about the history of this bridge and about the conduct of the governmental agency or agencies responsible for providing a reasonably safe road.

CP at 24. The State refused to provide the records because Gendler would not sign the form.

¶7 Consequently, Gendler filed a complaint against John Batiste, chief of the WSP, in Thurston County Superior Court for violation of the PRA. WSP asserted that the requested records had been scanned and entered into a database created and compiled for federal highway safety

---

[1] The request form is submitted to the DOT, although it is located on the WSP web site and contains the official WSP logo.

reporting purposes and were therefore protected under 23 U.S.C. § 409. The trial court allowed the DOT to intervene, granting it party status as a codefendant because it collected, analyzed, and maintained the records sought and because WSP claimed only the DOT could produce them.

¶8 Both sides moved for summary judgment on the sole issue of WSP's legal obligation to provide the reports requested by Gendler. After hearing argument, the trial court issued a memorandum decision concluding that state troopers completed accident reports pursuant to their duty under RCW 46.52.060 to file, analyze, and publish statistical information about accidents. The trial court further reasoned that 23 U.S.C. § 409 did not protect these reports because they were completed for purposes unrelated to federal highway safety funding obligations. Accordingly, the trial court granted summary judgment to Gendler and ordered WSP to produce the public records.[2]

¶9 The Court of Appeals affirmed. *Gendler v. Batiste*, 158 Wn. App. 661, 242 P.3d 947 (2010). We granted the State's petition for review, *Gendler v. Batiste*, 171 Wn.2d 1001, 249 P.3d 181 (2011), and now affirm.

## II. ISSUE

¶10 Where the WSP has a statutory duty to file, tabulate, and analyze accident reports under RCW 46.52.060, does 23 U.S.C. § 409 protect the WSP against unconditional disclosure of those reports under the PRA because the data is also collected or compiled by the DOT pursuant to the federal hazard elimination program, 23 U.S.C. § 152?

## III. ANALYSIS

¶11 Resolution of this case requires analysis of the interplay between three primary statutes: (1) the PRA,

---

[2] Gendler brought a separate tort action against the State for his injuries that has been settled. *See* State Suppl. Br. at 3 & n.1.

chapter 42.56 RCW; (2) RCW 46.52.060 (WSP's duty); and (3) 23 U.S.C. § 409 (limited federal privilege). The PRA requires the WSP to disclose all public records upon request, including data from accident reports collected pursuant to its statutory duty. We hold § 409 is inapplicable to the WSP in this context because WSP collected and compiled the reports pursuant to RCW 46.52.060, and not for a § 152 purpose.

A. PRA

██ ██ ¶12 The PRA requires state and local agencies to disclose all public records upon request, unless the record falls within a PRA exemption or other statutory exemption. RCW 42.56.070(1); *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 250, 884 P.2d 592 (1994) (*PAWS*). We review agency actions taken or challenged under the PRA de novo. RCW 42.56.550(3); *Spokane Police Guild v. Wash. State Liquor Control Bd.*, 112 Wn.2d 30, 34-35, 769 P.2d 283 (1989).

¶13 The PRA is regularly referred to as "a strongly worded mandate for broad disclosure of public records." *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978); *Yakima County v. Yakima Herald-Republic*, 170 Wn.2d 775, 790, 246 P.3d 768 (2011). Its underlying policy is evidenced by RCW 42.56.030:

> The people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created.

This court has also stated that the PRA's intent is

> nothing less than the preservation of the most central tenets of representative government, namely, the sovereignty of the people and the accountability to the people of public officials

and institutions. [Former] RCW 42.17.251 [(1992), *recodified as* RCW 42.56.030]. Without tools such as the Public Records Act, government of the people, by the people, for the people, risks becoming government of the people, by the bureaucrats, for the special interests. In the famous words of James Madison, "A popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." Letter to W.T. Barry, Aug. 4, 1822, 9 *The Writings of James Madison* 103 (Gaillard Hunt, ed. 1910).

*PAWS*, 125 Wn.2d at 251.

■ ¶14 In order to promote this policy and protect the public interest, the PRA is to be "liberally construed and its exemptions narrowly construed." RCW 42.56.030. Courts are also required to "take into account the policy . . . that free and open examination of public records is in the public interest, even though such examination may cause inconvenience or embarrassment to public officials or others." RCW 42.56.550(3).

■■ ¶15 " 'Public record' " is defined broadly to include "any writing containing information relating to the conduct of government or the performance of any governmental or proprietary function prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." Former RCW 42.17.020(42) (2008). It has long been recognized that administrative inconvenience or difficulty does not excuse strict compliance with public disclosure obligations. *Hearst Corp.*, 90 Wn.2d at 131-32; RCW 42.56.550(3). However, "[a]n agency has no duty to create or produce a record that is nonexistent." *Sperr v. City of Spokane*, 123 Wn. App. 132, 136-37, 96 P.3d 1012 (2004). The record sought must also be reasonably identifiable. *Id.* at 137.

■ ¶16 If there is any dispute over a government agency's obligation to disclose public records, the burden of proof is "on the agency to establish that refusal to permit public inspection and copying is in accordance with a statute that exempts or prohibits disclosure in whole or in part of

specific information or records." RCW 42.56.550(1); *Spokane Police Guild*, 112 Wn.2d at 35. There is no dispute in this case that WSP and DOT are subject to the PRA as state agencies. *See* former RCW 42.17.020(2) (2008) (" 'State agency' includes every state office, department, division, bureau, board, commission, or other state agency.").

¶17 The WSP also admitted in its answer that the accident reports sought by Gendler are public records. CP at 13. This was not disputed at either the trial court or the Court of Appeals. Yet, the State now argues in its petition for review that the records are confidential under RCW 46-.52.080, which provides that "accident reports and supplemental reports and copies thereof shall be without prejudice to the individual so reporting and shall be for the confidential use of the . . . chief of the Washington state patrol."

¶18 This argument is without merit. In *Guillen v. Pierce County*, we distinguished between reports submitted by motorists that were confidential and reports submitted by law enforcement officers that were not. 144 Wn.2d 696, 713-15, 31 P.3d 628, 34 P.3d 1218 (2001) (*Guillen I*), *rev'd on other grounds*, 537 U.S. 129, 123 S. Ct. 720, 154 L. Ed. 2d 610 (2003) (*Guillen II*). We ruled police accident reports are subject to disclosure under the PRA. *Id.* We noted that citizens are entitled to disclosure of certain "raw data" from motorists' reports, including the number, frequency, and circumstances of accidents occurring at a particular location. *Id.* at 715 n.8. Gendler seeks only reports submitted by law enforcement officers. CP at 416. Those reports are not confidential under RCW 46.52.080.

¶19 Accordingly, Gendler properly requested disclosure of public records from WSP, a state agency.

B. WSP's Statutory Duty

¶20 Since 1937, with the enactment of Washington's motor vehicle act, Title 46 RCW, law enforcement officers in this state have been required to prepare accident reports for

accidents on state highways. RCW 46.52.030 (Laws of 1937, ch. 189, § 135). Drivers involved in collisions may also submit a vehicle collision report. RCW 46.52.030(1). These reports are compiled and collected pursuant to RCW 46.52-.060 (Laws of 1937, ch. 189, § 138) of the motor vehicle act, which imposes a duty on the chief of the WSP to

> file, tabulate, and analyze all accident reports and to publish annually, immediately following the close of each fiscal year, and monthly during the course of the year, statistical information based thereon showing the number of accidents, the location, the frequency, whether any driver involved in the accident was distracted at the time of the accident and the circumstances thereof, and other statistical information which may prove of assistance in determining the cause of vehicular accidents.

These reports must then be made available to the DOT "for further tabulation and analysis for pertinent data relating to the regulation of highway traffic, highway construction, vehicle operators and all other purposes." RCW 46.52.060.

¶21 The record in this case establishes that WSP provided accident reports collected pursuant to the above statutory duty on request for many years. CP at 295. WSP was also able to, and did, provide reports of accidents that occurred at the same location. *Id.* The basic process of the WSP involved receiving paper accident reports and then sorting the reports' reference numbers by city street names and five-digit county road reference numbers. CP at 305. Thus, if a citizen wanted reports from accidents occurring at a specific location, he or she would provide the WSP with the street name or county road reference (available through the county engineer). CP at 304-05. The WSP would then search the paper reports to obtain the collision report numbers specific to the identified location. CP at 305.

¶22 The State asserts that under this system, it was not possible for the WSP to produce an "accurate" list of location-specific accident reports. *See, e.g.*, Pet. for Review at 9, 13. It is unclear exactly what the State deems accurate,

but this assertion may be evaluated in light of the DOT's current ability to narrow accident locations down to 1/100 of a mile or roughly 50 feet.[3] CP at 195. In any event, it is undisputed that these reports, however accurate or burdensome, were provided upon request to members of the public for several years. The State's own public records officer explained in a deposition in response to such requests that before 2003 she "would roll out a big long bunch of paper reports and try to find every reference to that particular street I could" but that it was "time-consuming." CP at 305.

¶23 This process changed in 2003 after the United States Supreme Court decided *Guillen* II, limiting the scope of the federal privilege allowed by 23 U.S.C. § 409. That case and the state records policy that followed are discussed below.

## C. Limited Federal Privilege

¶24 In 1966, the United States Congress adopted the Highway Safety Act to improve highway safety by encouraging closer federal and state cooperation with respect to road improvement projects. 23 U.S.C. § 402. As part of this effort to improve the nation's highways, Congress also adopted the hazard elimination program in 1973. 23 U.S.C. § 152. Under this program, state governments are provided federal funding to improve the most dangerous sections of their roads. *Id.* To be eligible for the funding, states are required to systematically undertake a thorough evaluation of their public roads. *Id.* Specifically, states must

> conduct and systematically maintain an engineering survey of all public roads to identify hazardous locations, sections, and elements, including roadside obstacles and unmarked or poorly marked roads, which may constitute a danger to motorists, bicyclists, and pedestrians, assign priorities for the correction

---

[3] The Montlake Bridge is 345 feet long, according to a recently published DOT technical manual. Wash. State Dep't of Transp., Bridge List M 23-09.05, at 377 (Oct. 2011), http://www.wsdot.wa.gov/publications/manuals/fulltext/M23-09/BridgeList.pdf.

of such locations, sections, and elements, and establish and implement a schedule of projects for their improvement.

23 U.S.C. § 152(a)(1).

¶25 This program raised concerns among the states because the increased self-reporting of data increased the risk of tort liability. *See Guillen* II, 537 U.S. at 133-34. In 1987, Congress enacted 23 U.S.C. § 409 at least in part to address these concerns. Section 409 generally provided that information compiled by states pursuant to 23 U.S.C. § 152 could not be admitted into evidence in any action for damages. The statute was amended in 1991 to add that such information may not be the subject of discovery.[4] Today, § 409 reads:

> Notwithstanding any other provision of law, reports, surveys, schedules, lists, or data compiled or collected for the purpose of identifying, evaluating, or planning the safety enhancement of potential accident sites, hazardous roadway conditions, or railway-highway crossings, pursuant to sections 130, 144, and 148[5] of this title or for the purpose of developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds shall not be subject to discovery or admitted into evidence in a Federal or State court proceeding or considered for other purposes in any action for damages arising from any occurrence at a location mentioned or addressed in such reports, surveys, schedules, lists, or data.

### 1. *Guillen* II

¶26 The United States Supreme Court limited the scope of this protection in *Guillen* II. That case arose from Ignacio

---

[4] *Guillen* I, 144 Wn.2d at 717-24, provides a detailed account of the history surrounding § 409.

[5] 2005 amendments (Pub. L. No. 109-59, § 1401(1)(3)(C), 119 Stat. 1144, 1225) to § 409 struck "152" and inserted "148." Section 1401 also eliminated the hazard elimination program under 23 U.S.C. § 152, and incorporated it into § 148 for purposes of certain federal funding programs. But the authorization for the federal funding resides in 23 U.S.C. § 152, and § 152 has not been repealed. H.R. Rep. No. 109-203, at 861-62 (2005), *reprinted in* 2005 U.S.C.C.A.N. 452, 482-84. The parties and the Court of Appeals refer only to § "152."

Guillen's request for accident reports and other materials and data under our state's PRA[6] at the location of an intersection where his wife was killed in an automobile accident. *Guillen* II, 537 U.S. at 136. When Pierce County refused to provide any responsive information, Guillen brought an action for violation of the PRA. *Id.* Like the WSP in this case, the county attempted to justify its refusal by claiming the accident reports were privileged under § 409 because another agency, the public works department, collected the records for a purpose related to § 152. *Guillen* II, 537 U.S. at 136. The Court disagreed.

¶27 Three different interpretations were argued. The county argued that a document initially prepared and held by an agency for purposes unrelated to § 152 became protected under § 409 when a copy of that document was collected by another agency for purposes of § 152. *Guillen* II, 537 U.S. at 143. Guillen countered that § 409 protected only materials actually created by the agency responsible for compliance with § 152. *Guillen* II, 537 U.S. at 144.

¶28 The United States, as intervenor, proposed a third interpretation that was adopted by the Court: "§ 409 protects only information compiled or collected for § 152 purposes, and does not protect information compiled or collected for purposes unrelated to § 152, as held by the agencies that compiled or collected that information." *Id.* at 146. The Court explained that this was the proper scope of the rule because it was broad enough to encompass information collected from other agencies for § 152 purposes, while at the same time taking "a narrower view of the privilege by making it inapplicable to information compiled or collected for purposes unrelated to § 152 and held by agencies that are not pursuing § 152 objectives." *Guillen* II, 537 U.S. at 145-46. The Court also held § 409 was an eviden-

---

[6] In 2005, the legislature recodified and renamed the public disclosure act (PDA), former chapter 42.17 RCW (1973), as the PRA, chapter 42.56 RCW. Laws of 2005, ch. 274, § 103. While *Guillen* (I and II) arose under the PDA, for clarity, we refer to the statute as the PRA.

tiary privilege and, as such, "must be construed narrowly because privileges impede the search for the truth." *Guillen* II, 537 U.S. at 144.

¶29 Under this rule, "an accident report collected only for law enforcement purposes and held by the county sheriff would not be protected under § 409" even if the same report was held by another agency that obtained the report for § 152 purposes. *Guillen* II, 537 U.S. at 144. This approach is consistent with the purpose of § 409 because the statute is not intended to make tort victims worse off than they would have been had § 152 never existed. *Guillen* II, 537 U.S. at 146. In other words,

> there is no reason to interpret § 409 as prohibiting the disclosure of information compiled or collected for purposes unrelated to § 152, held by government agencies not involved in administering § 152, if, before § 152 was adopted, plaintiffs would have been free to obtain such information from those very agencies.

*Id.*

### 2. Memorandum of Understanding

¶30 Months after the decision in *Guillen* II was published, WSP and DOT entered into a memorandum of understanding (MOU) pursuant to the Interlocal Cooperation Act, chapter 39.34 RCW. *See* CP at 205-07 (MOU). The Interlocal Cooperation Act allows state agencies to exercise their respective authority jointly and cooperatively. RCW 39.34.030(2). However, "[n]o agreement made pursuant to th[e Act] relieves any public agency of any obligation or responsibility imposed upon it by law." RCW 39.34.030(5).[7]

¶31 The MOU provides that DOT is to maintain all accident reports in its database. CP at 205. It does not explicitly reference the § 152 hazard elimination program, but the State asserts the DOT collects the data for purposes of compliance with the program. *See, e.g.*, Pet. for Review at

---

[7] This limitation is subject to certain exceptions, not applicable to this case. *See* RCW 39.34.030(5)(a)-(b).

7. To this end, the DOT implemented a uniform accident report form that contains specific data points required under § 152. CP at 194. This form is now filled out by law enforcement officers at the scene of a collision. *Id.* The WSP then scans the accident report into the DOT computer system and destroys the paper originals. CP at 205. The scanned image is then deemed to be the "report of record." *Id.*

¶32 With respect to funding, both parties reference 2003 legislative budget notes, wherein the WSP and DOT are encouraged to enter into an interagency agreement for reimbursement to DOT for the accident report activities previously performed by WSP. *See* WASHINGTON STATE LEGIS-LATIVE BUDGET NOTES: 2003-05 BIENNIUM AND 2003 SUPPLEMEN-TAL, PROGRAM T-TRANSPORTATION PLANNING, DATE, & RESEARCH cmt. 8, at 388 (Oct. 2003), http://lead.leg.wa.gov/leap/bud-get/index_lbns.asp. We note that this document is not law but a publication of various House and Senate committees, prepared with the assistance of the Legislative Evaluation and Accountability Program Committee, and intended to provide detail for enacted budgets. The referenced note specifically stated, "It is the intent of the Legislature that funding the costs associated with the collection, compila-tion, tabulation, analysis, and publication of accident re-ports, police officer and investigator reports . . . shall not impair or impinge on any party's rights under the state [PRA]." *Id.* cmt. 13, at 389. At least according to the budget notes, the reappropriation of funds was not intended to affect any citizen's rights under the PRA.

¶33 Furthermore, the MOU does not limit WSP's access to, or use of, the reports. CP at 205-07. Rather, the MOU establishes that the original reports and the scanned im-ages remain the property of the WSP. CP at 206. The "[d]ata collected and tabulated" by the DOT, however, is considered to be the property and responsibility of the DOT. *Id.* When a request is made for multiple accident reports "based solely on a location," it is treated as a request for data and is

referred to the DOT. CP at 209. Before receiving the reports, the requester must sign a certification that he or she will not use the reports in any litigation against the state, tribal, or local government involving a collision at the location in question. CP at 27.

¶34 Based on this arrangement, the State claims the reports requested by Gendler are privileged under § 409 because they are compiled or collected by the DOT pursuant to its § 152 federal highway safety reporting obligation. We disagree.

D. Gendler's Request for Public Records

¶35 The trial court correctly ordered the WSP to provide copies of the accident reports upon Gendler's request without the State's limitation. WSP has a long standing duty to "file, tabulate, and analyze all accident reports." RCW 46.52.060. The accident reports sought by Gendler were existing, identifiable public records, subject to disclosure under the PRA. The issue is whether federal law stands in the way.

¶36 To determine whether § 409 applies, the relevant inquiry is whether the information was compiled or collected, and held, by an agency for purposes unrelated to § 152. *Guillen II*, 537 U.S. at 146. While the PRA is construed broadly to promote open government, this limited federal privilege is narrowly construed because it impedes the search for truth. Accordingly, we hold § 409 is inapplicable to the WSP in this context because it collected and compiled the reports pursuant to RCW 46.52.060 and not for a § 152 purpose.

¶37 The Court of Appeals correctly noted the State fails to explain how the county sheriff in *Guillen* is any different from the WSP in this case, or how the public works department is any different from the DOT. *See Gendler*, 158 Wn. App. at 674. The records, when held by the WSP, are not privileged as they would be if held by the DOT because each agency collects and uses the records for different purposes.

¶38 The MOU cannot alter the WSP's obligations under RCW 46.52.060. *See* RCW 39.34.030(5). Furthermore, the language of the MOU itself supports Gendler's position. It confirms that the reports remain the property of the WSP, regardless of form, and that the WSP is not limited in its access to or use of the reports. CP at 205-07. The fact that DOT is granted joint access to and use of the reports for its own purpose does not change the character of the reports or divest WSP of its authority or ability to produce them. Indeed, the WSP continues to own even the scanned image of the accident report. CP at 205-06. These facts are sufficient to conclude that the WSP continues to "hold" the records, even though they reside in a joint database.

¶39 Nor does the type of form utilized by the WSP transform collection of the information into a joint WSP-DOT § 152 purpose. While the form was designed to include many categories of information needed by the DOT, which the WSP does not ultimately use, it is nevertheless filled out by law enforcement officers for WSP's own statutory purpose.

¶40 A remarkably similar scenario was addressed in *Goza v. Parish of West Baton Rouge*, 2008-0086 (La. App. 1 Cir. 5/5/09), 21 So. 3d 320, *cert. denied*, 130 S. Ct. 3277 (2010). In that case, an injured motorist sued the state's Department of Transportation and Development (DOTD), alleging a design defect of a highway curve. *Id.* at 325. The DOTD relied on § 409 and sought to exclude from the matter accident reports related to the location. *Goza*, 21 So. 3d at 326. The DOTD created the accident report form and trained local law enforcement officers to properly complete the form to fulfill its obligations under § 152. *Goza*, 21 So. 3d at 328. However, as in this case, the law enforcement officers also compiled and collected information contained on the form pursuant to its own statutory duty to investigate and report accidents. *Id.* Applying *Guillen* II, the *Goza* court held § 409 did not apply because the records were compiled or collected for a purpose unrelated to § 152. As the court reasoned:

> To the extent that law enforcement accommodates the DOTD by adopting the uniform accident report forms designed by the DOTD for use in accident investigation, such action alone is insufficient to transform the normal accident investigation duties of local law enforcement agencies into an act of "information compilation and collection for § 152 purposes." As such, we find no merit in the DOTD's argument that the mere completion of the form designed by the DOTD, and completed in accordance with training provided by the DOTD, makes the completion of an accident report by local law enforcement officials an act of compiling or collecting information for § 152 purposes.

*Goza*, 21 So. 3d at 328. This is the appropriate analysis, and we adopt it here. As in *Goza*, the WSP and DOT are acting together in some respects, but their purposes are separate.

¶41 It is also significant that long before the creation of the database, WSP was searching its reports and finding and disclosing information like that requested by Gendler. WSP now claims it cannot search reports by a specific location without the analysis performed by DOT. However, the fact that WSP has chosen to relocate its records into a database that is subsequently analyzed in greater detail by the DOT does not relieve it of its obligation to produce the records upon request. The trial court correctly ruled in its memorandum decision that "[i]f anything, these documents currently should be more available to the public, just as they are more available to the agencies who manage the database." CP at 322.

¶42 This reasoning is consistent with our *Washington State Access to Justice Technology Principles* (hereinafter AJT), http://www.courts.wa.gov/court_rules/. These principles apply to all courts of law and serve as a guide for all other actors in our state justice system. AJT scope. The AJT preamble declares, "The use of technologies in the Washington State justice system must protect and advance the fundamental right of equal access to justice. There is a particular need to avoid creating or increasing barriers to

access." AJT pmbl. " 'Technology' " includes "all mechanisms and means used for the production, *storage, retrieval*, aggregation, transmission, communication, dissemination, interpretation, presentation, or application of information." AJT scope (emphasis added). "[A]ccess to justice" means the meaningful opportunity to acquire information necessary to assert a claim or defense. AJT pmbl. WSP cannot shield otherwise disclosable accident reports under the guise of § 409 by depositing them in a forbidden DOT electronic database. Permitting this would fly in the face of our well grounded principle that technology should enhance access to information that is necessary for justice, not create barriers.

¶43 WSP's interpretation of the MOU and § 409 is also contradictory to *Guillen* II. That decision made clear that § 409 was not intended to make tort victims any worse off than they would have been before the § 152 hazard elimination program. The WSP's duty to generate these accident reports predates the federal program by 36 years. Until 2003, citizens have been able to request and receive copies of accident reports specific to a location. The State now asks us to place Washington citizens in a worse position than they would have been before § 152. The State's argument is rejected. It is inconsistent with *Guillen* II and the intent of § 409.

¶44 Section 409 does not extend to police accident reports generated and received by WSP pursuant to its own statutory duty.[8] The WSP's shared database with DOT does not alter this duty or its obligations under the PRA. The

---

[8] The dissent would remand the case to the trial court to take further evidence on the factual issue of whether the WSP compiled the data in question to comply with its duty under RCW 46.52.060. This is unnecessary. RCW 46.52.060 requires the WSP to collect accident reports, identifying accidents by location. This duty predates § 152, and it is undisputed the accident reports were available to the public, however accurate, before the hazard elimination program. *See* CP at 304-05 (state public records officer explaining WSP provided accident reports based on street name or county road reference). The fact that the DOT and WSP have consolidated the collection process through the implementation of a more detailed form does not negate the WSP's independent statutory duty. The record

Court of Appeals correctly affirmed the trial court's order to produce the reports without limitation upon Gendler's request. We hereby affirm the Court of Appeals and the trial court.

E. Gendler's Attorney Fees

¶45 The prevailing party in an action against a state agency to obtain access to a public record is entitled to costs, including reasonable attorney fees. RCW 42.56-.550(4). "Attorney fees incurred on appeal are included" in this provision. *PAWS*, 125 Wn.2d at 271. To be awarded attorney fees or expenses on review before this court, the party must make the request in its opening brief. RAP 18.1(b). Additionally, "[r]equests made at the Court of Appeals will be considered as continuing requests at the Supreme Court." *Id.* Because we affirm both the trial court and Court of Appeals, Gendler is the prevailing party in this action to obtain access to a public record. Gendler also specifically requested his attorney fees and costs in his opening brief at the Court of Appeals. *See* Br. of Resp't at 40. Accordingly, we hereby award Gendler his reasonable attorney fees and costs, to be determined by the commissioner or clerk in accordance with RAP 14.6.

## IV. CONCLUSION

¶46 The WSP has an independent statutory duty under RCW 46.52.060 to "file, tabulate, and analyze" accident reports and to annually publish statistical information showing, among other things, the location of such accidents. The PRA requires the WSP to disclose all public records upon request, including data from accident reports collected pursuant to its statutory duty. We hold § 409 is inapplicable to the WSP in this context because it collected and compiled the reports pursuant to RCW 46.52.060, and not for a § 152

substantially supports the conclusion that the WSP collected the information sought by Gendler to comply with this duty.

purpose. We therefore affirm the trial court and Court of Appeals and award Gendler his reasonable attorney fees and costs on appeal.

MADSEN, C.J.; C. JOHNSON, CHAMBERS, OWENS, and STEPHENS, JJ.; and ALEXANDER, J. PRO TEM., concur.

¶47 SEINFELD, J.[*] (dissenting) — The plain language of RCW 46.52.060 does not require the Washington State Patrol (WSP) or Washington State Department of Transportation (WSDOT) to include the level of detail regarding traffic accident locales that Michael Gendler seeks in his public disclosure request. Nonetheless, the majority holds that the WSP does have a duty under that statute to compile reports showing the precise locations of all accidents in this state. The majority supports this holding by looking to the WSP's historical practices and its internal need for this detailed information. Absent evidence in the record to support this holding, this court should conclude that the WSP compiled this data in order to comply with federal law, which includes a privilege from disclosure (23 U.S.C. § 409), and not as part of a state statutory duty.

¶48 This case turns on the critical *factual* question of the purpose for which the WSP or WSDOT compiled the data in question. Did it do so to satisfy the mandate in RCW 46.52.060, or did it do so to comply with 23 U.S.C. § 409? A close examination of the factual evidence in the record is necessary to answer this question. Here, there is a paucity of factual support for the majority's holding. Therefore, I would vacate the trial court's order granting summary judgment to Gendler and remand this matter to the trial court for the taking of further evidence establishing either that (1) the WSP has historically maintained records with this detailed information and supplied it to the public or (2)

---

[*] Judge Karen G. Seinfeld is serving as a justice pro tempore of the Supreme Court pursuant to Washington Constitution article IV, section 2(a).

the WSP requires this level of detail to properly meet its other statutory duties. Without this evidence, the detailed reports that Gendler seeks "shall not be subject to discovery or admitted into evidence in a . . . State court proceeding." 23 U.S.C. § 409. Thus, I respectfully dissent from the majority's opinion that the record is sufficient to show that the WSP violated the Public Records Act, chapter 42.56 RCW, by failing to provide the requested information.

## DISCUSSION

¶49 In a public records case, "[a]gencies are required to disclose any public record on request unless it falls within a specific, enumerated exemption." *Neighborhood Alliance of Spokane County v. Spokane County*, 172 Wn.2d 702, 715, 261 P.3d 119 (2011) (citing RCW 42.56.070(1)). "The burden is on the agency to show a withheld record falls within an exemption, and the agency is required to identify the document itself and explain how the specific exemption applies in its response to the request." *Id.* (citing RCW 42.56.550(1)). On summary judgment, however, "the appellate court determines whether genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law." *Drinkwitz v. Alliant Techsystems, Inc.*, 140 Wn.2d 291, 295, 996 P.2d 582 (2000). "Facts are reviewed in the light most favorable to the nonmoving party." *Id.*

¶50 This case involves the interplay of 23 U.S.C. § 409 and the Public Records Act. According to the United States Supreme Court, § 409 "protects . . . information compiled or collected for [23 U.S.C.] § 152 purposes." *Pierce County v. Guillen*, 537 U.S. 129, 146, 123 S. Ct. 720, 154 L. Ed. 2d 610 (2003) (*Guillen* II). Section 152 specifically requires a state or local government to "conduct and systematically maintain an engineering survey of all public roads to identify hazardous locations." 23 U.S.C. § 152(a)(1). And § 409 explicitly protects information gathered "for the purpose of

developing any highway safety construction improvement project which may be implemented utilizing Federal-aid highway funds" from discovery or use in tort litigation. 23 U.S.C. § 409.

¶51 Here, the evidence suggests that the information sought by Gendler was gathered under § 152. In his declaration, Brian Limotti, the WSDOT assistant manager of collision data, stated, "It is not possible for either the WSP or WSDOT to generate an accurate list of collisions at a specific location using nothing other than the raw collision report." Clerk's Papers (CP) at 196. Instead, "[a]n accurate list of collisions at a specific location can only be generated after the collection of the data embedded in the [police traffic collision report], compilation of that data, and analysis of the raw collision reports that is performed by WSDOT for federal § 152 purposes." CP at 196-97.

¶52 The only other factual evidence in the record regarding WSDOT's record keeping is in the deposition of Kip Johnson, the WSP collision records supervisor, and John Messina, a Washington State trial attorney who filed a declaration at the plaintiff's request. Johnson explained in his deposition that the WSP did not have the resources or knowledge to index collisions by location. CP at 202, 329. Messina's declaration is vague and nonspecific; he states without a specific reference to the WSP or WSDOT that "governmental entities with whom I have dealt . . . provid[ed] [accident reports, photos, and other information]." CP at 295. He also states, "I have also accessed accident history data in various ways from the Patrol." CP at 296. But he fails to state the time period or nature of this "accident history data." *Id.* These omissions in an otherwise very carefully crafted declaration suggest that the critical information simply does not exist.

¶53 Viewing these statements in the light most favorable to the nonmoving party (the WSP), the Limotti declaration indicates that the WSP or WSDOT compiled the precise detailed site information sought by Gendler in order

to comply with federal law § 152, and not pursuant to a duty to maintain these records under RCW 46.52.060 or other state law. *See Guillen* II, 537 U.S. at 146 (explaining that the court should look to the purpose for which the information is compiled in determining whether it was compiled to meet a statutory duty). The Johnson declaration supports Limotti's testimony as to the purpose for which the information was compiled. Further, the Messina declaration lacks the specificity needed to challenge Limotti's testimony. Without further evidence that the State was maintaining these records to comply with state rather than federal highway law standards, the federal privilege from discovery should control the outcome of this case.

## CONCLUSION

¶54 I would reverse the Court of Appeals, vacate the order granting summary judgment to Michael Gendler, and remand for the taking of further evidence. To grant relief to Gendler, the evidence must be sufficient to establish that (1) the WSP or WSDOT needs precise accident location information to perform their statutory duty under RCW 46.52.060 or (2) there is a pattern or practice of the WSP compiling these reports in the past for its own internal purposes. Thus, I respectfully dissent.

J.M. JOHNSON, J., concurs with SEINFELD, J. PRO TEM.