**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| ARTHUR C. BANKS, an individual; TONEY MONTGOMERY, an individual; and WHITNEY BRADY, an individual, | No. 52072-9-II |
| Respondent/Cross-Appellant, | |
| v. | |
| CITY OF TACOMA, a municipal corporation, | UNPUBLISHED OPINION |
| Appellant/Cross-Respondent. | |

GLASGOW, A.C.J.—Four Tacoma residents jointly requested records under the Public Records Act (PRA), chapter 42.56 RCW, from the City of Tacoma Police Department about its use of cell site simulators, which allow the Department, with a court order, to locate a cell phone. The requesters then sued the City, alleging its response violated the PRA.

Both parties filed cross motions for summary judgment. The trial court ruled in favor of the plaintiffs, concluding that the City violated the PRA by failing to disclose an unedited billing spreadsheet, certain records that had been provided to prior PRA requesters, a warrant application template, and citizen review panel meeting minutes. The trial court also partially granted the City's motion for summary judgment, holding that make, model, and pricing information about cell site simulators was exempt from disclosure. The trial court awarded penalties due to inadequate searches and improper withholding but did not order the City to perform further searches. The trial court awarded attorney fees to the plaintiffs.

On appeal, the City contends that the trial court erred by deciding it violated the PRA. The plaintiffs cross appeal, arguing that the trial court erred by determining that make, model, and

pricing information was exempt and not ordering additional searches, including for simulator operating manuals. The City appeals the penalty and attorney fees award in favor of the plaintiffs and both parties request attorney fees on appeal.

We reverse the trial court's ruling in favor of the plaintiffs regarding the billing spreadsheet and remand for an evidentiary hearing because deposition and affidavit testimony conflicted about the spreadsheet, but we otherwise affirm the PRA violations. We affirm the trial court's ruling allowing redaction of make, model, and pricing information because this information is specific intelligence information exempt from disclosure. We also affirm the trial court's decision not to require additional searches but remand for an evidentiary hearing to determine whether the City used any operating manual at the time of the request, making it a responsive public record that should have been disclosed with appropriate redactions.

We affirm the trial court's penalties except for those associated with citizen review panel meeting minutes and the billing spreadsheet, which we reverse. We remand for recalculation of penalties consistent with our opinion and the resolution of the remaining factual issues identified above. We affirm the award of attorney fees to the plaintiffs below and grant attorney fees to the plaintiffs on appeal.

FACTS

In 2015, Gregory Christopher,[1] Arthur C. Banks, Toney Montgomery, and Whitney Brady jointly requested records from the Tacoma Police Department about its use of cell site simulators under the PRA.

---

[1] Gregory Christopher was a requester and a plaintiff. On July 6, 2017, the trial court entered an order granting Christopher's CR 41 motion for voluntary dismissal and amended the caption.

A.    Cell Site Simulators

Cell site simulators mimic wireless carrier cell towers. *See* RCW 9.73.260(1)(f). When deployed, nearby mobile phones and cellular data devices connect to a cell site simulator, which can locate the device based on its signaling information. *Id.* This type of surveillance technology is also commonly referred to as a "Stingray" device although the manufacturer, Harris Corporation, makes several different models with different names. *See* Clerk's Papers (CP) at 224.

A cell site simulator is similar to a "pen, trap, and trace" device. CP at 1392; RCW 9.73.260(1)(d)-(f). Both are used to locate cellular devices, but a cell site simulator may pinpoint the location of a cell phone more precisely. Law enforcement cannot use either device without a warrant. RCW 9.73.260(2). Under RCW 9.73.260(5), a phone company can be ordered to provide certain services and information to law enforcement if presented with a warrant authorizing use of a cell site simulator.

In 2013, the City purchased cell site simulator technology and entered into a nondisclosure agreement with the Federal Bureau of Investigation (FBI), requiring the City to consult with the FBI before disclosing information about the simulators to the public. Only the officers who worked in the special investigations unit (also known as the technical unit) of the Department used or operated the City's cell site simulator.

B.    Request for Records and Response

Relevant to this appeal, Christopher, Banks, Montgomery, and Brady requested:

- "1. All records regarding [Tacoma Police Department's] acquisition, use, or lease of Cell Site Simulators." CP at 16.
- "8. All communications regarding Cell Site Simulators, including . . . between Tacoma Police Department and any other local, state, or federal agency or person." CP at 17.
- "10. All applications submitted to . . . courts for warrants, orders, or other authorization for use of Cell Site Simulators in criminal investigations, as well as any warrants, orders, authorizations, denials of warrants, denials of orders,

3

denials of authorization, and returns of warrants associated with those applications." CP at 17.

Michael Smith, a deputy City attorney and legal advisor to the Department, coordinated the search for responsive records. The City ultimately provided 560 pages of responsive documents. The City generally withheld or redacted records that revealed the make, model, and pricing of Harris Corporation cell site simulators, as well as operational details of the City's device. The City claimed this information was exempt from disclosure because it was specific intelligence information essential for effective law enforcement. The City later provided some missed spreadsheets, but otherwise confirmed it had provided all possible responsive material.

C.    Procedural History

In 2016, the requesters filed a complaint alleging that the City violated the PRA by failing to disclose all responsive records, failing to provide a complete log or cite valid exemptions for withheld records, and improperly redacting and withholding records. The plaintiffs sought all responsive records, penalties, attorney fees, and costs, and asked the trial court to order any other appropriate equitable relief.

During discovery, the City provided additional documents relating to its use of cell site simulators that it had previously failed to disclose. The plaintiffs also obtained documents from non-City sources that related to the City's use of cell site simulators, some of which the City had failed to provide. During depositions, where disputes arose about the adequacy of the City's search, the City performed some additional searches to ensure that all responsive records had been provided.

The City and the plaintiffs then filed cross motions for summary judgment. The plaintiffs argued that the City violated the PRA by unlawfully withholding 11 responsive documents that

the plaintiffs later obtained during litigation. Primarily, the plaintiffs alleged that an inadequate search caused the failure to disclose these responsive documents in response to the PRA request.

The plaintiffs included the 11 documents as exhibits to their motion for summary judgment. Exhibit 4 was the complete billing log spreadsheet that the City used to track payments to phone companies. Exhibits 5-9 were e-mails between the Department and the FBI addressing what the City could disclose about its cell site simulator. Exhibit 10 was a blank warrant application template that the City used to obtain court orders for the use of cell site simulators. Exhibits 11-13 were meeting minutes that discussed cell site simulators. Exhibit 15 was an invoice from Harris Corporation.

The plaintiffs further argued that the City misapplied the specific intelligence exemption and improperly redacted or withheld make, model, and price information about the simulators and an operator's manual. The plaintiffs also argued that the City violated the PRA by failing to adequately search for certain records that the plaintiffs believed should have been disclosed, but were not. The plaintiffs sought an order requiring the City to more thoroughly search for these additional records.

The City responded that it had conducted an adequate and reasonable search for all responsive records, properly redacted specific intelligence information, and had no duty to provide nonexistent records. The City asserted that the later discovery of some additional responsive documents did not mean the City's search violated the PRA.[2]

The trial court partially granted the plaintiffs' motion for summary judgment, concluding that the City violated the PRA by failing to disclose exhibits 4-13 and 15. The trial court partially granted the City's motion for summary judgment, ruling that make and model information relating

---

[2] Detailed facts relevant to each issue are discussed in the analysis below.

to cell site simulators was exempt and could be redacted. The trial court did not specify whether any operator's manuals were also exempt on this basis. The trial court declined to order additional searches. The plaintiffs moved for reconsideration or clarification, arguing again for an order requiring additional searches. The trial court denied this request.

The trial court awarded a total of $182,340 in statutory penalties against the City. The trial court discussed the *Yousoufian* II[3] factors used by Washington courts to inform public records penalties and found at least five aggravating factors but did not mention mitigating factors. The trial court also awarded the plaintiffs $109,885 in attorney fees.

The City appeals the order granting the plaintiffs' motion for summary judgment, the penalty award, and the attorney fee award in favor of the plaintiffs. The plaintiffs cross appeal the order to the extent it granted partial summary judgment to the City on the application of the specific intelligence information exemption. The plaintiffs also cross appeal the denial of their motion for reconsideration or clarification and ask this court to order the City to search for additional responsive records. Both parties request attorney fees and costs on appeal.

---

[3] *Yousoufian v. Office of Ron Sims*, 168 Wn.2d 444, 229 P.3d 735 (2010) (*Yousoufian* II).

ANALYSIS[4]

I. THE CITY'S APPEAL

A.     Public Records Act

The PRA is a "'strongly worded mandate for broad disclosure of public records.'" *Serv. Emps. Int'l Union Local 925 v. Univ. of Wash.*, 193 Wn.2d 860, 866, 447 P.3d 534 (2019) (*SEIU*) (internal quotation marks omitted) (quoting *Yakima County v. Yakima Herald-Republic*, 170 Wn.2d 775, 791, 246 P.3d 768 (2011)). The PRA is "liberally construed and its exemptions narrowly construed." RCW 42.56.030. An agency must disclose responsive records unless it proves a specific exemption in the PRA or another statute applies. RCW 42.56.070(1); *Fisher Broad.-Seattle TV LLC v. City of Seattle*, 180 Wn.2d 515, 521-22, 326 P.3d 688 (2014). But an agency does not have to create or disclose records that do not already exist. *West v. City of Tacoma*, 12 Wn. App. 2d 45, 79, 456 P.3d 894 (2020).

The PRA requires adequate searches for responsive records. *Neigh. All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 721, 261 P.3d 119 (2011). An inadequate search is treated as a PRA violation. *Id.*

A trial court reviews agency actions under the PRA de novo and "may conduct a [PRA] hearing based solely on affidavits." RCW 42.56.550(3). If a requester alleges that an agency wrongfully denied its request, "The burden of proof shall be on the agency to establish that refusal

---

[4] As an initial matter, we note that neither party included assignments of error in its opening brief. The plaintiffs assert assignments of error are unnecessary for their cross appeal in this case because the issues are subject to de novo review. They are wrong. RAP 10.3(a)(4) requires assignments of error with no exceptions. We address issues not raised in assignments of error only "when the nature of the challenge is perfectly clear." *State v. Slanaker,* 58 Wn. App. 161, 166, 791 P.2d 575 (1990).

. . . is in accordance with a statute that exempts or prohibits disclosure in whole or in part of specific information or records." RCW 42.56.550(1).

We review de novo "both the agency action and the court opinions below." *Fisher*, 180 Wn.2d at 522; *see also* RCW 42.56.550(3). And if "the record on appeal consists solely of declarations or other documentary evidence, we stand in the same position as the trial court" and do not make credibility determinations. *SEIU*, 193 Wn.2d at 866. We review penalty assessments and attorney fees awarded under the PRA for abuse of discretion. *Hoffman v. Kittitas County*, 194 Wn.2d 217, 228, 449 P.3d 277 (2019); *Cedar Grove Composting, Inc. v. City of Marysville*, 188 Wn. App. 695, 729, 354 P.3d 249 (2015).

B.    Summary Judgment Burden and Standard of Review

Ordinary summary judgment burdens and standards apply in PRA cases. *Bldg. Indus. Ass'n of Wash. v. McCarthy*, 152 Wn. App. 720, 735-36, 218 P.3d 196 (2009). We apply the same standard as the trial court. *Neigh. All*., 172 Wn.2d at 715. Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). We review all evidence and reasonable inferences in the light most favorable to the nonmoving party and consider only the evidence that was brought to the trial court's attention. *West*, 12 Wn. App. 2d at 69-70; RAP 9.12. We review the trial court's conclusions of law de novo and may affirm on any basis supported by the record. *Bavand v. OneWest Bank, FSB*, 196 Wn. App. 813, 825, 385 P.3d 233 (2016); RAP 2.5(a).

On summary judgment, "the moving party bears the initial burden of showing the absence of a genuine issue of material fact." *Block v. City of Gold Bar*, 189 Wn. App. 262, 269, 355 P.3d 266 (2015). If the moving party meets its initial burden, "the inquiry shifts to the nonmoving party," who must "make a showing sufficient to establish the existence of a genuine issue of

material fact" in order to defeat summary judgment. *Id.* A material fact is one "upon which the outcome of the action depends." *McCarthy*, 152 Wn. App. at 735.

Under CR 56(e), the nonmoving party "may not rest upon the mere allegations or denials of a pleading, but a response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue" that must be resolved at a hearing. *See also Block*, 189 Wn. App. at 269. "[T]o avoid summary judgment," the nonmoving party must "present the court with 'facts . . . not just mere speculation, not wishes, not thoughts, but facts that would be admissible at trial.'" *McCarthy*, 152 Wn. App. at 736 (alteration in original) (quoting transcript).

C.      Trial Court's Conclusions About PRA Violations

"[T]he mere fact that a record is eventually found does not itself establish the inadequacy of an agency's search." *West*, 12 Wn. App. 2d at 79. And the failure to locate and disclose a record is not a per se violation of the PRA. *See Block*, 189 Wn. App. at 278. The touchstone is instead the adequacy of the agency's search. *Id.*

The adequacy of a search depends on the specific facts of the case. *Id.* The search must be "reasonably calculated to uncover all relevant documents." *Neigh. All.*, 172 Wn.2d at 720. An agency must search more than one place "if there are additional sources for the information requested." *Id.* Even so, it need not "search *every* possible place a record may conceivably be stored, but only those places where it is *reasonably likely* to be found." *Id.* Courts consider "the scope of the agency's search as a whole and whether that search was reasonable, not whether the requester has presented alternatives that [they] believe[] would have more accurately produced the records [they] requested." *West*, 12 Wn. App. 2d at 79. "[A]gencies are required to make more than a perfunctory search and to follow obvious leads as they are uncovered." *Neigh. All.*, 172 Wn.2d at 720.

On summary judgment, an agency must show the search was adequate beyond material doubt. *Id* at 721. "[T]he agency may rely on reasonably detailed, nonconclusory affidavits submitted in good faith[,] . . . [which] should include the search terms[,] . . . the type of search performed, and . . . establish that all places likely to contain responsive materials were searched." *Id.*

1.      The City's search for responsive records, generally

Smith distributed a copy of the plaintiffs' request to all members of the Department's technical unit and people in their chain of command, including deputy chiefs, and Smith discussed the request with them. Smith and the technical unit members searched their computers and e-mail accounts. Smith was confident the team would thoroughly search their e-mails and hard drives because they had processed similar requests before, were familiar with what responsive records existed, and knew how the records were retained.

Smith also contacted other City departments that he thought might have responsive records, including the finance department, internal affairs, the training unit, and possibly the city manager's office. Smith testified in a deposition that he typically followed up with people gathering records to "close the loop" and ensure that all responsive records were being provided. CP at 576. Our record does not contain a contemporaneous written log or description of the people and departments Smith contacted about the plaintiffs' request, nor does our record contain a contemporaneous list of the places searched or the search terms used. Smith explained that he was describing the steps he took in response to this request from memory.

2.      Billing spreadsheet (ex. 4)

*Facts:* Phone companies charged the City every time it used a pen, trap, and trace device or cell site simulator, so the police department kept one billing spreadsheet to track their use of

10

both devices. Because the plaintiffs only requested records regarding the use of cell site simulators, not pen, trap, and trace devices, Smith and the plaintiffs' attorney agreed that the City would provide an edited spreadsheet containing only entries relating to the use of a cell site simulator during 2015. The City then provided the agreed-upon document, which Smith believed contained only entries relating to the cell site simulator.

During discovery, the plaintiffs received the complete, unedited billing spreadsheet (Ex. 4) from the City. In a deposition, Detective Terry Krause said that the complete billing spreadsheet included instances where a pen, trap, and trace instrument was used as a well as instances where a cell site simulator was used. But he explained, "[W]here we deployed the equipment, it would say 'capture'" in a field on the spreadsheet. CP at 854.

J. Shipp,[5] on the other hand, testified in his deposition that nothing in the spreadsheet consistently indicated whether a cell site simulator, rather than a pen, trap, and trace device, was used. And J. Shipp said that when he added entries to the spreadsheet, he put his name in the "'Driver'" column to indicate that a cell site simulator was used, but he did not know if other detectives did the same. CP at 302.

Citing Krause's deposition testimony, the plaintiffs argued on summary judgment that the edited spreadsheet was not fully responsive because it contained only 3 entries while the complete spreadsheet contained 11 entries with the phrase "capture" or "attempt capture." CP at 668-70, 1260.

The trial court concluded that the City's failure to provide the complete spreadsheet violated the PRA. The trial court appeared to focus on the City's failure to disclose the full

---

[5] There are two witnesses with the same last name of Shipp, Jeffrey Shipp (a former employee of the Department) and Christopher Shipp (a detective with the Department). These witnesses are referred to as J. Shipp and C. Shipp.

spreadsheet without claiming an exemption justifying withholding, but the parties agree on appeal that the real issue was whether the City complied with the agreement between the parties to provide an edited spreadsheet that reflected all instances where the cell site simulator was used.

After the hearing on summary judgment but before the penalty hearing, the City submitted a clarifying affidavit from C. Shipp in which he addressed whether "the word 'capture' on the billing spreadsheet indicate[d] that the cell site simulator was used." CP at 1469. C. Shipp clarified, "It is possible that in some instances that is what the word indicates," but "the word capture also means that the cellular device was located by the information provided by the phone company without the use of the cell site simulator." *Id.* C. Shipp stated, "The word 'capture' can also mean officers successfully located a suspect by other means." *Id.*

*Analysis:* The City contends the trial court erred by deciding that it violated the PRA when it disclosed the billing spreadsheet. We conclude that a genuine issue of material fact exists as to whether the spreadsheet that the City disclosed complied with the parties' agreement, and an evidentiary hearing on this issue is required on remand.

Viewing the evidence in the light most favorable to the nonmoving party, the City provided testimony that the edited spreadsheet it provided contained all of the cell site simulator uses during the relevant time period. C. Shipp's affidavit provided evidence that, contrary to what Krause described, the word "capture" did not necessarily correspond to the use of a cell site simulator. There is an issue of fact about whether the edited spreadsheet contained all responsive information because the City offered nonspeculative, admissible testimony from C. Shipp supporting its argument. *McCarthy*, 152 Wn. App. at 736.

We reverse the trial court's conclusion that the City violated the PRA with regard to the edited billing spreadsheet and remand for an evidentiary hearing to resolve whether the edited

spreadsheet was fully responsive and compliant with the parties' agreement. We recognize that it is rare for a public records action to require an evidentiary hearing with testimony, but because the detectives' statements appear to conflict, this is the rare case where an evidentiary hearing with testimony is warranted.

      3.      <u>E-mails and invoice (exhibits 5-9 and 15)</u>

*Facts:* Regarding the records provided to prior PRA requesters (exhibits 5-9 and 15), Smith testified that he looked for responsive records in a folder where he typically placed e-mails relating to prior PRA requests for cell site simulator records, but he stated that he might not have placed all relevant e-mails in the folder. Smith did not look for responsive materials among copies of prior PRA responses. The City gave exhibits 5-9 and 15 to the plaintiffs during discovery months later when the plaintiffs asked for records provided to past PRA requests about cell site simulators.[6]

*Analysis:* The City argues that the trial court erred by ruling that it violated the PRA by failing to disclose these five sets of e-mails and one invoice. We disagree.

In *Fisher*, a journalist submitted a PRA request for a list of dash camera videos tagged by the police department for retention. 180 Wn.2d at 519. The city denied the journalist's request, explaining that it would be technologically infeasible and prohibitively expensive to search the computer system for the requested list. *Id.* at 519-20. However, a different journalist then submitted a nearly identical PRA request, and the city provided that requester with a list of dash camera videos that would have been responsive to the first journalist's request. *Id.* at 520, 524. The court held that the city's response to the second journalist's request was "uncontroverted

_____

[6] The City's attorney stated in an affidavit that one invoice was also "inadvertently omitted from [the City's] initial production to the plaintiffs but which the City subsequently produced in discovery." CP at 483.

evidence . . . that a partial response could have been produced at the time of the original denial," and the city violated the PRA. *Id.* at 524.

Here, the City's response to discovery similarly shows that these documents could have been disclosed in response to the PRA request. The City does not dispute on appeal that these e-mails or invoices were responsive to the plaintiffs' request and acknowledges that the e-mails still existed in the Department's computer system.[7] While the City is correct that an agency need not "search every possible place a record may conceivably be stored," it does have to search those places where responsive records are "reasonably likely to be found" and the search must be "reasonably calculated to uncover all relevant documents." *Neigh. All.*, 172 Wn.2d at 720 (emphasis omitted). Smith explained that he knew where to look for records because the City had received and responded to dozens of prior requests for the same or similar records. The files in which the City stored responses to past PRA requests about cell site simulators were an obvious place to look for responsive records.

The City claims it would be an unreasonable "months-long task" to search previous PRA responses for documents responsive to each new request on the same subject. Reply Br. of Appellant at 24. But inconvenience is no excuse: "free and open examination of public records is in the public interest, even though such examination may cause inconvenience . . . to public officials or others." RCW 42.56.550(3). And the City produced prior PRA responses to similar requests in discovery. This belies the City's assertion that these records were so burdensome to locate that the task could not conceivably be done.

---

[7] Accordingly, the City's contention that it had no obligation under the PRA to provide a record that did not exist at the time of the PRA request is misplaced.

Moreover, there are ways for an agency to ensure a PRA-compliant response, even where locating responsive documents is difficult. The City could have tracked prior requests in a searchable spreadsheet containing the language of each request, and requests and responses could have been assigned unique tracking numbers. This would allow prior requests to be easily searched and prior responses easily located.

Upon realizing that plaintiffs' PRA request was similar to a prior request, the City could have contacted the plaintiffs, explained that the City had similar but not completely coextensive prior responses, and clarified whether the plaintiffs wanted copies of the prior responses right away even if they were overinclusive. This would not have relieved the City of the obligation to update their search for responsive documents, *see* RCW 42.56.520(1)(d), but it could have eased the burden of carefully reviewing prior responses to remove nonresponsive records. And if the plaintiffs declined copies of prior responses, the City could have confirmed this clarification in writing. *Id.*

Finally, the City could have provided a time estimate for gathering and producing records from its collection of responses to prior requests. RCW 42.56.520(1)(c). Where locating and reviewing records is difficult, an agency can commit to working on the request for a reasonable amount of time per week, for example, to avoid negatively impacting other requesters. *See Cortland v. Lewis County*, 14 Wn. App. 2d 249, 258, 473 P.3d 272 (2020), *review denied*, 196 Wn.2d 1039 (2021). An agency can disclose responsive records in installments until the response is complete. *Id.* Sometimes this process takes months, or even years. But simply concluding that locating and disclosing requested records would be too hard or too time-consuming is not adequate under the PRA.

We affirm that the City violated the PRA by failing to disclose exhibits 5-9 and 15 in response to the plaintiffs' PRA request.

4.    Blank warrant application template (exhibit 10)

*Facts:* The City did not provide a blank warrant application template (exhibit 10) to the plaintiffs because it thought the template was not responsive to the plaintiffs' request. This template was a customizable document that technical unit officers used whenever they sought a warrant from the superior court authorizing the use of a cell site simulator. The warrant application portion included predrafted sections describing how cell site simulators worked, a description of what information could be gathered by a cell site simulator, and prompts for inserting a probable cause statement and other statutorily required information. The document also explained when the police department might need to use a cell site simulator rather than a pen, trap, and trace device.

Krause stated in a deposition that the template for the warrant application "just incorporates that language [of the statute] so that they don't have to rewrite. . . . But . . . there's nothing in the blank other than the RCW." CP at 1497. Similarly, the City's attorney, Margaret Elofson, said the template was a "blank form" that was not responsive to the plaintiffs' request because the City did not provide blank forms or templates to requesters unless the request specifically asked for blank documents. CP at 1479.

*Analysis:* The City argues that the trial court erred in concluding it violated the PRA by not providing the blank warrant template because the blank template was not responsive to the plaintiffs' request for materials relating to the Department's use of cell site simulators. We disagree.

The template shows what the City must do to obtain a warrant to use a cell site simulator, which is a step necessary for the City's use of a cell site simulator. Although it does not appear

that the City was trying to hide the warrant template, the City interpreted the plaintiffs' request more narrowly than its actual wording and failed to recognize that the blank warrant template fit within the plain language of the request.

Even if the City had a general policy of not providing blank templates to requesters unless specifically requested, the City nonetheless violated the PRA, which requires broad disclosure, because the template was responsive under the plain language of the request. *SEIU*, 193 Wn.2d at 866. And if the City was not sure the template was being requested, it could have complied with the PRA simply by asking the requesters for clarification. RCW 42.56.520(1)(d).

The City also argues that the plaintiffs' use of the phrase "'all records regarding [the police department]'s use . . . of Cell Site Simulators'" was overbroad and not allowed under the PRA because the language did not specifically "identify the records sought." Br. of Appellant at 17 (bold face omitted). But this argument is misplaced because "a request for all records *regarding a particular topic* . . . shall *not* be considered a request for all of an agency's records" and thus is not overbroad under the statute. RCW 42.56.080(1) (emphasis added).

We affirm that the City violated the PRA by withholding exhibit 10.

5.      Citizen review panel meeting minutes (exhibits 11-13)

*Facts:* The city manager's office, a City department separate from the police department, administered a citizen review panel that focused on community oversight of policing in Tacoma. During 2015, members of the Department presented about the use of the cell site simulator at two meetings, and the panel discussed simulators at a third. These presentations and discussions were recorded in meeting minutes, which were posted on the City's website accessible to the public. The City did not disclose these minutes, but the plaintiffs acquired them from an outside source.

Smith asked several City departments outside the police department to look for responsive records, which he testified was common practice. Smith did not recall if he contacted the city manager's office in this particular case because he was "no longer able to distinguish the various requests clearly in [his] memory." CP at 1116. But Smith was clear that he had contacted the city manager for other PRA requests.

*Analysis:* The City argues that the trial court erred by deciding that it violated the PRA when it did not disclose the meeting minutes because it was not reasonably likely that the city manager's office would have responsive records. We disagree.

The City acknowledges that the meeting minutes were responsive to the plaintiffs' request. Smith obtained responsive records from the city manager's office for prior PRA requests about cell site simulators and there was no evidence he specifically ruled out the city manager's office in this case. The city manager's office housed the citizen review panel, which reviews police department actions. A reasonably calculated search would have included the city manager's office given that the request incorporated a topic addressed by the citizen review panel. The City has not established that its failure to search the city manager's office was reasonable, even though this was likely an oversight. *Neigh. All.*, 172 Wn.2d at 720-21.

To the extent the City suggests it did not violate the PRA because the meeting minutes were available on the City's website, this may be relevant to severity of the appropriate penalty, but it does not prohibit a conclusion that the City violated the PRA. Under RCW 42.56.520(1)(b), an agency may comply with a PRA request by "[p]roviding an internet address and link on the agency's web site to the specific records requested," but there is no evidence the City did so.

We affirm that the City violated the PRA by failing to disclose exhibits 11-13.

In sum, we reverse the trial court's conclusion that the City violated the PRA by providing the edited version of the billing spreadsheet and remand for an evidentiary hearing to resolve apparent conflicts in the detectives' testimony regarding this spreadsheet. We affirm all of the trial court's other conclusions regarding PRA violations.

## II. PLAINTIFFS' CROSS APPEAL

A.    Specific Intelligence Information Exemption and Redactions

*Facts:* The City redacted from invoices and other responsive records the make, model, and price of its cell site simulator components under the specific intelligence information exemption. The United States Department of Justice submitted a statement of interest and provided an affidavit from FBI Supervisory Special Agent Russell Hansen. The statement of interest explained the FBI's position that disclosure of make and model information about cell site simulators could threaten national security. Hansen's affidavit discussed the national security importance of cell site simulators. Hansen emphasized that disclosing even seemingly "innocuous" information about the simulators could give "adversaries . . . information about the capabilities, limitations, and circumstances of the equipment's use," from which they could "accumulate information and draw conclusions about the use and technical capabilities of the technology" and "take countermeasures designed to thwart the use of the technology." CP at 501-02. The Department of Justice also explained in a letter to the City that "technical information" about the City's cell site simulator is considered homeland security information and its disclosure is prohibited under federal law. CP at 675.[8]

---

[8] The PRA also permits withholding or redaction of information that cannot be disclosed under another statute prohibiting disclosure, including federal statutes. RCW 42.56.070(1). This is an independent basis for withholding component make, model, and pricing information.

The City also submitted an affidavit from FBI Supervisory Special Agent Benjamin R. Inman. Inman said that criminals could use information about the specific makes and models of cell site simulators in concert with other publicly available information about cell site simulators "*to exploit any weaknesses of the particular make and model, to purchase or build counteracting equipment, or to utilize a different type of cellphone or device that is not vulnerable to the specific* [*cell site simulator*] *equipment*." CP at 1139 (emphasis added).

*Analysis:* The plaintiffs contend that the trial court erred by granting the City's motion for summary judgment to the extent it approved redaction of the make, model, and pricing of cell site simulators. We disagree.

Under RCW 42.56.240(1), an agency is not required to disclose "[s]pecific intelligence information . . . compiled by investigative, law enforcement, and penology agencies . . . the nondisclosure of which is essential to effective law enforcement or for the protection of any person's right to privacy." The purpose of this exemption is to "protect the integrity of law enforcement investigations." *West*, 12 Wn. App. 2d at 70-71.

The PRA does not define the term "specific intelligence information," but Washington courts have held that the word "'specific'" refers to "'disclos[ing] particular methods or procedures for gathering or evaluating intelligence information.'" *Id.* at 71 (quoting *Haines-Marchel v. Dep't of Corr.*, 183 Wn. App. 655, 669, 334 P.3d 99 (2014)).

Washington courts have held that footage from prison video surveillance systems, for example, was specific intelligence information because it "would allow prisoners to exploit weaknesses in [the] surveillance system." *Gronquist v. Dep't of Corr.*, 177 Wn. App. 389, 400, 313 P.3d 416 (2013); *Fischer v. Dep't of Corr.,* 160 Wn. App. 722, 727-28, 254 P.3d 824 (2011). By contrast, footage from university campus security cameras did not qualify for an exemption

20

under RCW 42.56.240(1) in part because a university campus is a very different setting than a prison, reducing the chances that releasing footage would hinder essential law enforcement activity. *See Jane Does 1-15 v. King County*, 192 Wn. App. 10, 28, 366 P.3d 936 (2015).

In *West*, which involved a similar PRA request for information about Tacoma's cell site simulators, we held that the city failed to establish that make, model, and pricing information about the city's cell site simulators constituted specific intelligence information subject to a PRA exemption. 12 Wn. App. 2d at 73. The *West* court emphasized that neither the city's evidence nor the FBI affidavit in support of the federal government's statement of interest explained how certain cell site simulator "technology makes or models might differ from others and why knowledge of these distinctions would be dangerous in the hands of criminals." *Id.* at 75.

Here, Inman specifically stated that criminals could combine information about the makes and models of Tacoma equipment with publicly available information about the capabilities of various cell site simulators to thwart their effectiveness and evade law enforcement detection. He explained that this information could be used to evade or counteract the cell site simulator.

The plaintiffs' own expert report demonstrates that pricing information must be withheld because it can be used to determine what cell site simulator components the City has purchased. The plaintiffs' experts used component pricing information to glean what upgrade the Department had purchased and attached this pricing information as an exhibit to their report. In addition, the plaintiffs' experts were able to obtain at least one manual, which they used to draw inferences about the City's devices, showing that non-law enforcement parties can obtain such things. This evidence supports redaction of pricing information as well as makes and models from invoices and other documents.

We depart from *West* based on differences in our record and affirm the trial court's ruling in favor of the City with regard to redaction of make, model, and pricing information about cell site simulators.

B.      The Trial Court's Refusal to Order Additional Searches

In their cross appeal, the plaintiffs contend that the trial court erred by declining to order the City to conduct additional searches.

1.      Data allegedly stored on the simulator and associated laptop

*Facts:* The plaintiffs retained two experts, a computer science doctoral student and a former University of Washington computer science researcher, who submitted a report about the data collecting capacity of the City's cell site simulator. Although they did not examine the City's simulator, the experts opined that the City's device collected, processed, and stored in the associated laptop "identifiable metadata from target and bystander cellular devices," possibly "without the knowledge of the operator." CP at 885. The experts described software that they believed was necessary to view or export data from the simulator. The experts also noted that their "opinions [could not] be established with certainty without inspecting the cell-site simulator radio devices and the computers running the software that controls them." CP at 888.

Krause, on the other hand, stated in his deposition that neither the City's cell site simulator nor the associated laptop stores data or metadata. Krause reiterated this position in a later declaration, stating, "I am aware that the plaintiffs in this lawsuit allege that the City has retained data on its computers associated with the cell site simulator. That is incorrect." CP at 1393. Krause explained that he had since "searched the cell site simulator laptop for any retained data and there is none." CP at 1393-94. Similarly, FBI agent Hanson stated that cell site simulators do not collect and retain data.

*Analysis:* The plaintiffs ask this court to order the City to search again for stored data. We decline.

The plaintiffs rely on their expert report. But the experts did not examine the City's cell site simulators and instead inferred that the City's simulators must have collected and stored data in some form. Krause's deposition testimony and Hansen's affidavit rebut the plaintiffs' contentions. Krause searched the cell site simulator and laptop for responsive records and found nothing, which he explained in detail in his affidavit. Because the plaintiffs' experts have not actually examined the City's devices, they acknowledged that they could not "establish with certainty" whether the City's cell site simulators actually collected and stored data. CP at 888. And there is no evidence in the expert report or elsewhere in the record that the City's cell site simulator runs on the same type of software described in the expert's report. The City has thus met its burden by providing reasonably detailed, nonconclusory, good faith affidavits establishing that the City searched for stored data on the simulator and laptop and found none. *See Neigh. All.*, 172 Wn.2d at 720-21.

Even if stored data existed, the plaintiffs also have not offered any nonspeculative evidence that it would be an "identifiable record" under RCW 42.56.080(1). "The PRA does not . . . require agencies to 'create or produce a record that is nonexistent.'" *Fisher*, 180 Wn.2d at 522 (internal quotation marks omitted) (quoting *Gendler v. Batiste*, 174 Wn.2d 244, 252, 274 P.3d 346 (2012)). The PRA defines "public record" broadly and requires disclosure of "existing data compilations from which information may be obtained" "regardless of physical form or characteristics." RCW 42.56.010(3)-(4). But "mining data" and "creating a new document . . . is more than the PRA requires." *Fisher*, 180 Wn.2d at 523. The City was not obligated under the PRA to create a record

by obtaining new software or mining data from the simulator or laptop to create a new document. RCW 42.56.010(3)-(4); *see also Fisher*, 180 Wn.2d at 523-24.

We reject the plaintiffs' argument that the City failed to adequately search and disclose records about stored data. The plaintiffs are not entitled to an order requiring additional searches on the basis of this claim.

2.    Additional warrant and related e-mail records

*Facts:* Upon receiving authorization from the superior court to use a cell site simulator, officers in the technical unit would send the warrant to the phone company. C. Shipp, Smith, and Krause testified that warrants were scanned and sent directly from the police department's copy machines, leaving no record of the warrant or e-mail on the machine or Department computers. The City also provided a manual for City copy machines establishing that for data security reasons, the machines were programed to overwrite any records transmitted by the machine.[9]

Technical unit officers sometimes received warrant applications for the use of cell site simulators from law enforcement officers in other jurisdictions, but Smith and Krause testified that the City did not retain any copies of these documents. C. Shipp also noted that the Department disclosed the use of cell site simulators to prosecutors and those communications might happen "either verbally or by e[-]mail," but said he personally could only recall talking to a prosecutor about a cell site simulator over the phone. CP at 808.

*Analysis:* The plaintiffs argue that the City failed to adequately search for e-mails related to cell site simulator warrants that officers may have sent to telecommunications companies, e-

---

[9] Although the plaintiffs also suggest that the police department would e-mail telecommunications companies for additional information about operating the cell site simulator, C. Shipp testified that he would generally call the company or verbally communicate with his supervisors who would pursue the issue.

mails to prosecutors about cell site simulators, and related warrant applications delivered to the Department by law enforcement in other jurisdictions. We disagree.

The City presented uncontroverted evidence that materials associated with an application for a warrant to use a cell site simulator were filed under seal at the superior court and the City did not retain copies. The City also did not retain warrant applications from other jurisdictions and only speculated about e-mails to prosecutors containing references to cell site simulators. The technical unit detectives searched their own e-mail accounts for responsive records and there is no evidence in the record that others had e-mails related to cell site simulator warrants. And under the PRA, the City had no obligation to disclose nonexistent records and only had to perform searches that were "reasonably calculated" to unearth responsive records. *Neigh. All.*, 172 Wn.2d at 720; *Gendler*, 174 Wn.2d at 252. In light of the City's evidence, the plaintiffs are not entitled to additional searches based on these claims.

3.    Records held by South Sound 911

*Facts:* South Sound 911 was an entity contracted to provide record-keeping services for the police department. South Sound 911 held the City's investigative files, which were then accessed directly by police department staff. Smith sometimes directed requesters to seek records from South Sound 911, but he did not think South Sound 911 could have had responsive documents in this case because investigative files did not contain warrant applications for cell site simulators.

*Analysis:* The plaintiffs contend that the City's search was inadequate because it failed to search South Sound 911 for responsive records. We disagree.

The plaintiffs did not offer specific evidence that South Sound 911 housed responsive records, or that the City should have considered it a reasonably likely location for responsive

records. The plaintiffs, rather, speculate that some of South Sound 911's investigative files might contain references to cell site simulators.

The City, however, provided specific evidence in the form of Smith's deposition testimony establishing it was not reasonable to look for responsive records at South Sound 911 because investigative files did not contain information about the use of cell site simulators. Because the City did not have to disclose nonexistent records or search a location not reasonably likely to have responsive records, its failure to search South Sound 911 was not an inadequate search. The plaintiffs are not entitled to relief on the basis of this claim. *Neigh. All.*, 172 Wn.2d at 720; *Gendler*, 174 Wn.2d at 252.[10]

In sum, we affirm the trial court's decision not to order additional searches for stored data, additional warrant and e-mail records, or South Sound 911 records.

C.      Operator's Manual

*Facts:* The City originally listed "[o]perator's manuals for cell sit[e] simulators" in its privilege log as withheld records. CP at 23. Later, Krause testified that the Department received hard copy manuals with the original equipment, but destroyed or sent them back to the

---

[10] The City suggested below that South Sound 911 was an independent agency and the City had no duty to ask South Sound 911 to search for responsive records on the plaintiffs' behalf, but it does not raise this argument on appeal. The City's position that it can simply refer requesters to South Sound 911 was risky given that the City used South Sound 911's database on a daily basis. *Nissen v. Pierce County*, 183 Wn.2d 863, 881-83, 357 P.3d 45 (2015) (records "used" by an agency employee must be gathered and disclosed if they are responsive to a public records request, even if the device storing the record is not owned by the agency). In contrast, Washington courts have held that where responsive materials are stored by another entity but the agency does not actively use the records held by the other entity, the agency does not need to look outside its own materials. *See Limstrom v. Ladenburg*, 136 Wn.2d 595, 604 n.3, 963 P.2d 869 (1998) (lead opinion) (The PRA "does not require, and we do not interpret it to require, an agency to go outside its own records and resources to try to identify or locate the record requested."), and *Koenig v. Pierce County*, 151 Wn. App. 221, 232-33, 211 P.3d 423 (2009) (prosecutor's office had no duty to inquire if other county departments held responsive records to PRA request).

manufacturer before the plaintiffs' PRA request was received. J. Shipp also recalled that the original physical manuals were destroyed, but said that the police department received an electronic copy of an updated manual with a software upgrade around the same time, possibly in 2011. J. Shipp said officers accessed the electronic manual from the laptop associated with the simulator and described the electronic manual as "[p]art of the equipment." CP at 1085.

*Analysis:* The plaintiffs argue the City improperly withheld operator's manuals for the cell site simulators and ask this court to order the City to search the laptop associated with the simulator and disclose a redacted copy. The City responds that it did not have any operating manuals in any form at the time of the plaintiffs' request and the reference to a manual in the privilege log was a scrivener's error. We remand for an evidentiary hearing to determine the existence of any operating manuals.

"[W]hether an entity must disclose a public record" depends on "whether the record requested is 'prepared, owned, used, or retained' by that entity, not simply whether that entity possesses the record at the time of the request." *Associated Press v. Wash. State Legislature*, 194 Wn.2d 915, 930, 454 P.3d 93 (2019) (quoting RCW 42.56.010(3)). Accordingly, even if officers only accessed the manual *through* the laptop, as suggested by J. Shipp, the manual might still be an identifiable public record that must be disclosed in a redacted form if City employees *used* the manual. *See id.*; *see also* RCW 42.56.080(1); *Nissen*, 183 Wn.2d at 881-83.

The plaintiffs rebutted the City's motion for summary judgment because J. Shipp's deposition testimony created a genuine issue of material fact with regard to whether City employees used an electronic version of an operating manual that could be disclosed. CR 56(e); *Block*, 189 Wn. App. at 269. J. Shipp's testimony provides admissible, nonspeculative evidence supporting the plaintiffs' contention that an electronic copy of the operating manual could be

accessed through the laptop. There is also an issue of fact about whether officers otherwise used an operating manual, which could trigger a duty to disclose under the PRA regardless of where the manual is housed. *See Associated Press*, 194 Wn.2d at 930.

If City employees used an electronic version of an operating manual at the time the public records request was submitted, then a redacted version of the manual must be provided. In light of the specific intelligence information exemption discussed above, redactions would likely be extensive. Nevertheless, unless the City can show that no part of the manual is disclosable, the plaintiffs would be entitled to a redacted copy.

We remand for an evidentiary hearing to determine if the City possessed or used any cell site simulator operating manuals at the time of the plaintiffs' request and whether the City violated the PRA by failing to provide any responsive manuals in redacted form.

III.  PENALTIES

The trial court imposed penalties for the City's PRA violations by grouping the 11 records into 5 categories and entering separate per day penalties ranging from $50 to $80 for each category. For the 2 categories comprised of more than 1 record, the trial court multiplied the per day penalty by the number of records. The trial court grouped the 4 e-mails and 1 invoice (exhibits 6-9 and 15) into one category and imposed a $50 per day penalty, multiplied by 192 days and 5 records, for a penalty of $48,000. Similarly, for the category containing 3 sets of citizen review panel meeting minutes (exhibits 11-13), the trial court imposed a daily penalty of $80, multiplied by 324 days and 3 records, resulting in a $77,760 penalty. The total penalty award was $182,340.

The City contends the trial court abused its discretion when it applied the *Yousoufian* II factors and set penalties for the City's PRA violations. The City does not argue that the trial court

failed to apply the *Yousoufian* II factors, but contests the trial court's conclusions about individual factors.

The PRA gives the trial court discretion to impose penalties for violations "not to exceed one hundred dollars for each day that [they were] denied the right to inspect or copy said public record." RCW 42.56.550(4). In *Yousoufian* II, the Supreme Court "set forth a nonexclusive list of aggravating and mitigating factors, including agency bad faith, to guide trial courts as they exercise discretion." *Hoffman*, 194 Wn.2d at 219. "[T]he factors may overlap, are offered only as guidance, may not apply equally or at all in every case, and are not an exclusive list of appropriate considerations," and no single factor controls. *Id*. "We holistically review the overall penalty assessment for abuse of discretion," and do not perform "piecemeal de novo review of individual *Yousoufian* II factors." *Id*. at 228.

The trial court entered an order expressly considering many of the *Yousoufian* II factors. The trial court did not mention mitigating factors and found at least five aggravating factors, including delayed responses, lack of supervision, negligence, and unreasonableness in any explanations given for noncompliance as well as lack of proper training, and the need to award a penalty "in an amount necessary to deter future misconduct," especially "when considering the City's agency size and the facts of this case." CP at 1657.

Although the trial court did not expressly consider all of the *Yousoufian* II aggravating and mitigating factors in its written order, the case law does not require a trial court to formulaically apply these factors, nor does this court conduct piecemeal review of the factors. *Hoffman*, 194 Wn.2d at 228. Moreover, both parties extensively discussed the aggravating and mitigating *Yousoufian* II factors in their briefs and oral argument at the penalty stage. The trial court addressed faulty practices in the City's public records processes, including failure to search prior public

records responses and failure to treat templates as responsive regardless of the language of the request. We conclude that the trial court's penalty award, viewed holistically and deferring to the trial court's discretion, is not manifestly unreasonable in most respects, but we remand for redetermination of two individual awards.

With regard to the withheld meeting minutes, some penalty was appropriate but we hold the severe penalty for these records was an abuse of discretion. The trial court imposed an $80 per day, per record penalty for the City's failure to provide 3 sets of citizen review panel minutes, exhibits 11-13, for a total of $240 per day for 324 days, resulting in $77,760 for those records alone.

The undisputed evidence shows that Smith typically worked with the city manager if he believed that office had responsive records, but through an oversight the city manager's office did not provide the citizen review panel meeting minutes in response to this request, either because Smith did not alert them to the request or that office overlooked them. There is no evidence that this was anything more than an oversight. Although the trial court emphasizes that these documents were available on the City's website, it used this factor to aggravate, rather than mitigate, the penalty. The City had an obligation to disclose these records, either by providing copies or by alerting the plaintiffs to where they could be located on the website. But their availability to the public on the website during the entire penalty period should mitigate, rather than aggravate, the penalty amount. $80 *per record* is excessive for this mistake and we conclude that it amounts to an abuse of discretion.

In addition, the penalty calculation may need to be adjusted based on further proceedings on remand. The trial court's resolution of factual disputes regarding the billing spreadsheet and the operator's manuals may also require the trial court to revisit appropriate penalties on remand

for these records. The trial court has discretion to impose no penalties or different penalties regarding these records after the further development of facts. *See* RCW 42.56.550(4) (trial court has discretion to impose penalties only for violations of the PRA).

The trial court must reevaluate penalties for the delay in disclosing the citizen review board minutes and it may recalculate penalties if needed after resolution of factual issues on remand. We otherwise affirm the penalties imposed.

## IV. ATTORNEY FEES

A.      Attorney Fees Below

The trial court also awarded the plaintiffs attorney fees in the amount of $109,885. The City claims that the trial court abused its discretion when it awarded attorney fees to the plaintiffs without "reducing the plaintiffs' fees for unsuccessful claims, duplicated effort and other unproductive time." Br. of Appellant at 34. The City asks us to remand for a redetermination of attorney fees.

We review a trial court's fee segregation decision for abuse of discretion. *King County v. Vinci Constr. Grands Projects/Parsons RCI/Frontier-Kemper, JV*, 188 Wn.2d 618, 632, 398 P.3d 1093 (2017). The trial court abuses its discretion when its decision is manifestly unreasonable or its reasons untenable. *Id.* "[W]here the 'plaintiff's claims for relief . . . involve a common core of facts or [are] based on related legal theories,' a lawsuit cannot be 'viewed as a series of discrete claims' and, thus, the claims should not be segregated in determining an award of fees." *Fiore v. PPG Indus., Inc.*, 169 Wn. App. 325, 352, 279 P.3d 972 (2012) (alteration in original) (internal quotation marks omitted) (quoting *Brand v. Dep't of Labor & Indus.*, 139 Wn.2d 659, 672-73, 989 P.2d 1111 (1999)).

Here, the plaintiffs substantially prevailed because the trial court granted their motion for summary judgment in full, but granted the City's motion for summary judgment on only one issue. The adequate search, withholding, and redaction arguments relied on the same common core of facts because the depositions and affidavits on which they relied discussed all the issues and evidence for all three claims and was often elicited from the same witnesses. The trial court's decision not to further segregate attorney fees in these circumstances was not manifestly unreasonable and we affirm the attorney fees award.

B.      Attorney Fees on Appeal

Both parties request attorney fees on appeal under RAP 18.1. Under RCW 42.56.550(4), a PRA requester who prevails against the agency in a court action is entitled to attorney fees. This court's commissioner should determine the amount to be awarded to the plaintiffs and has flexibility to determine whether the fees can be segregated at this level and, if so, what portion of the total fees are attributable to the arguments on which the plaintiffs have prevailed on appeal.

CONCLUSION

We reverse the trial court's ruling in favor of the plaintiffs regarding the billing spreadsheet and remand for an evidentiary hearing on this issue. We also remand for an evidentiary hearing to determine whether the City used any operating manual at the time of the request, making it a responsive public record that should have been disclosed in a redacted form. We reverse the trial court's penalties associated with the citizen review panel meeting minutes and the billing spreadsheet. We remand for recalculation of penalties consistent with our opinion and further resolution of factual issues on remand. Otherwise, we affirm. We award attorney fees to the plaintiffs on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, A.C.J.

We concur:

Maxa, J.

Sutton, J.